In the Matter of the Application

of

TRI-CONTINENTAL CORPORATION,

Petitioner Below, Appellant,

*vs.*

STANLEY BATTYE, CENTRAL STATES ELECTRIC CORPORATION
IN REORGANIZATION, DREYFUS & CO., ILSE HIRSCHMANN,
OTTO HIRSCHMANN, MCDONNELL & CO., MERRILL
LYNCH, PIERCE, FENNER & BEANE, and GRIFFITH MOORE,

Respondents Below, Appellees,

for a determination by an appraiser to be appointed by the Chancellor, of the value of the stock of General Shareholdings Corporation held by defendants.

*Supreme Court, On Appeal, June 8, 1950.*

TERRY, CAREY, LAYTON and WOLCOTT, JJ., sitting.

*William Prickett* and *Wm. Dwight Whitney*, of the firm of Cravath, Swaine & Moore), of New York City, for appellants.

*Charles F. Richards,* of the firm of Richards, Layton & Finger, and *George Rosier* and *Zelig R. Nathanson,* of the firm of Austrian & Lance, of New York City, for appellees.

WOLCOTT, Judge, delivering the opinion of the court:

*Section* 61 of the *General Corporation Law, Revised Code* 1935, § 2093, provides that upon the merger of a corporation, stockholders who object to the merger and who fulfill the statutory requirements to register their objection shall be paid the value of their stock on the date of the merger, exclusive of any element of value arising from the expectation or accomplishment of the merger. The meaning of the word "value" under this section of the corporation law has never been considered by this court. However, the Court of Chancery has on several occasions applied a definition of value under the section. This definition was first formulated in *Chicago Corporation v. Munds,* 20 *Del.Ch.*

142, 172 *A*. 452, and was followed in *Root v. York Corporation*, 29 *Del.Ch.* 351, 50 *A.2d* 52, and *In re General Realty & Utilities Corporation*, 29 *Del.Ch.* 480, 52 *A.2d* 6. We think the basic doctrine of valuation applied in *Chicago Corporation v. Munds, supra*, was formulated in accordance with proper principles and the better reasoned authorities.

The basic concept of value under the appraisal statute is that the stockholder is entitled to be paid for that which has been taken from him, viz., his proportionate interest in a going concern. By value of the stockholder's proportionate interest in the corporate enterprise is meant the true or intrinsic value of his stock which has been taken by the merger. In determining what figure represents this true or intrinsic value, the appraiser and the courts must take into consideration all factors and elements which reasonably might enter into the fixing of value. Thus, market value, asset value, dividends, earning prospects, the nature of the enterprise and any other facts which were known or which could be ascertained as of the date of merger and which throw any light on future prospects of the merged corporation are not only pertinent to an inquiry as to the value of the dissenting stockholders' interest, but must be considered by the agency fixing the value.

The rule as stated requires that certain obvious conclusions be drawn. Thus, since intrinsic or true value is to be ascertained, the problem will not be settled by the acceptance as the sole measure of only one element entering into value without considering other elements. For example, as was specifically held in *Chicago Corporation v. Munds, supra*, market value may not be taken as the sole measure of the value of the stock. So, also, since value is to be fixed on a going-concern basis, the liquidating value of the stock may not be accepted as the sole measure of value.

General was a regulated closed-end investment company with leverage, and was engaged in the business of investing in the stock market generally seeking to acquire

and hold a cross-section of the stock market. Investments were made by General primarily with the possibility of capital appreciation in view. General's portfolio held diversified investments, practically all of which fell within the class of marketable securities readily liquidated.

A regulated close-end investment company is of a peculiar nature. The common stockholder of a closed-end company has no right at any time to demand of the company his proportionate share of the company's assets.[1] A regulated investment company is required to distribute all of its income from dividends and interest to its stockholders but, in so doing, pays no tax on the amounts so distributed. It also has the option of distributing net long-term capital gains to its stockholders or retaining them and paying a flat 25% tax. As in the case of individuals, a regulated investment company has the right to deduct capital losses from its capital gains.

On September 30, 1948, the day preceding the merger, General had outstanding debentures and preferred stock equaling in value 60.8% of the total assets of the company, leaving 39.2% of the company's assets applicable to the common stock. This condition of General made applicable the principle of leverage. Simply stated, this meant that since the debentures and preferred stock of General were a fixed liability, the same amount of assets at all times was required to be set off against them. The result of this unalterable fact was that if the stock market declined, thus decreasing the value of the assets of General, all of the decrease fell upon the common stock. On the other hand, when the stock market rose, thus increasing the value of General's assets, all of the increase accrued to the benefit of the common stock.

---

[1] In contradistinction, the stockholders of the so-called open-end company have the right at the close of business on designated days to demand from the company their proportionate share of the company's assets.

Experience demonstrates that when the stock market declines, the market price of the common stock of closed-end investment companies with leverage declines at a more rapid rate because of the resulting shrinkage of asset value behind the common stock. Conversely, a rise in the stock market results in a rise in the market price of the common stock of such companies at a more rapid rate than the market is increasing generally.

The closed-end feature and leverage have a direct effect on the market value of the common stock of closed-end investment companies. When the market price of the common stock moves into a certain price range in relation to its net asset value, upward leverage disappears and the stock sells on the market at a lower price than its net asset figure. This fact, together with the inability of the common stockholder to withdraw his proportionate interest in the assets of the company, has consistently resulted in a lower market value of the common stock in comparison with its net asset value. This difference between the net asset value and the market value of the common stock of a closed-end investment company is known as discount.

The record discloses that the common stock of General, prior to the merger, was selling within the price range which brought discount into play. The appraiser found the discount rate applicable to General to be 25%. This rate of discount is accepted for the purposes of this case since the parties do not argue that this finding was error.

Discount, therefore, may be applied to net asset value to determine on any day a theoretical or constructed market value of the common stock of a closed-end investment company with leverage. On September 30, 1948, the net asset value of the common stock of General was $4.90 per share and, if the discount of 25% is applied to that figure, a market value of General's common stock on that day of $3.67 per share is constructed.

The appraiser considered various factors which all

agree should be considered in valuing the common stock of General. Those factors were: The nature of the enterprise, i. e., a regulated closed-end investment company; leverage; discount; net asset value; market value; management; earnings and dividends; expenses of operation; particular stockholdings in General's portfolio; and a favorable tax situation which General had.

The appraiser found that the factors of management, earnings and dividends, expenses of operation, and the particular stockholdings of General, under the circumstances, were not entitled to be debited or credited in arriving at a value for the common stock. It is not necessary to review his reasons, for the parties are agreed that his findings in this respect were correct. Since, however, earnings and dividends of a corporation are ordinarily of prime importance in valuing common stock, we feel, in order to avoid future confusion, that we should state briefly why they are not of much importance in this case. The reason is that General was an investment company with large leverage which meant that normal income of the company necessarily went in large part to the servicing of the senior debentures and preferred stock, leaving a relatively small amount left to be paid out in dividends to the common. Actually, dividends on the common stock of General in the past were negligible, nor were the prospects for the future materially brighter.

The favorable tax situation of General was found by the appraiser to be worth 29c to each share of common stock. This finding is not urged as error. The favorable tax situation resulted from realized losses in 1948 and loss carryovers which would have enabled General to take profits gained before the end of 1948 equal to the realized losses incurred in 1948 and the loss carryover expiring at the end of that year, to the extent of over $1,500,000, without paying a 25% capital gains tax or distributing the proceeds to its stockholders who would then be taxed on them.

The appraiser found that, at the time of merger and prior thereto, there was no actual market of General's common stock uninfluenced by the merger and, accordingly, excluded actual market value of the stock as a factor to enter into the final determination of value. This was not error, nor would it have been error had the appraiser constructed a hypothetical uninfluenced market value by discounting the net asset value of the common stock on the day of merger and giving some effect to it in his final valuation. Had there been an actual market value uninfluenced by the merger in existence, it would have been error to disregard it, but the absence of such an element does not require the construction of a hypothetical market value to be given effect in the final determination of value.

A great deal of argument in this cause has turned around the phrase "net asset value" which is simply a mathematical figure representing the total value of the assets of General less the prior claims. The net asset value of the common stock of General could be determined as of any date by computing the total market value of the securities in the portfolio, adding to that sum the cash in the company's possession, deducting the total of the outstanding liabilities, debentures and preferred stock, and dividing the final result by the number of common shares outstanding.

However, since the value of dissenting stock is to be fixed on a going-concern basis, the taking of the net asset value as the appraisal value of the stock obviously is precluded by the rule. This is so because, primarily, net asset value is a theoretical liquidating value to which the share would be entitled upon the company going out of business. Its very nature indicates that it is not the value of stock in a going concern.

Furthermore, since we are called upon to fix the value of common stock in a closed-end investment company with leverage, an additional reason exists for the refusal to fix the value of that stock at its net asset value. This reason

is that the common stockholder of a closed-end company can never withdraw his proportionate interest from the company as long as it is a going concern. He can obtain his full proportionate share of the company's assets, or the net asset value of his stock, only upon liquidation of the company.[2] He cannot obtain the net asset value of his common stock by sale of the stock because of discount which is always applicable when the stock of the closed-end investment company is selling within the necessary price range, and which prevents the sale of the common stock except at a price less than the net asset value.

Since, therefore, net asset value is, in reality, a liquidating value, it cannot be made the sole criterion of the measure of the value of the dissenting stock. The appraiser, therefore, properly concluded that net asset value as of September 30, 1948 should not be taken as the basis for arriving at the appraisal value. He preferred, and we think correctly, to construct an asset value on the basis of month-end averages of the portfolio securities over a reasonable period of time. This method resulted in an asset figure of $5.15 per share of common stock of General. The appraiser also found that, during the period over which his average was taken, the stock market was normal. This finding is not attacked as error.

The fact that the stock market was normal during the period used for the establishment of the asset value of General's common stock bears directly on the application of the principle of leverage in this case. The element of leverage, it will be recalled, operates to increase the value of the common stock of a closed-end company as the stock market rises and, conversely, operates to decrease the value of the common stock of closed-end companies as the stock market

---

[2] Actually, net asset value of common stock of a closed-end company could never, as a practical matter, be obtained since liquidation would be accompanied by expense and would probably result in driving the market down through the sudden sale of large blocks of stock, thus automatically decreasing the net asset value.

sinks. The finding that the general level of the stock market is normal means that no adjustment in the value of the common stock was required because of the element of leverage. This is important because leverage, in the valuation of the common stock of closed-end companies, must be considered and given effect if it is an operating element at the time value is to be determined. The market being normal, leverage was not operating. Therefore, the value of the common stock of General did not have to be debited or credited because of the principle of leverage.

To the per share asset value of $5.15 so determined, the appraiser added 29c, the value of the favorable tax situation of General, to each share of its common stock. The result of $5.44 is called by the appraiser the "fair asset value" of a share of the common stock of General. The appraiser then arrived at the true or intrinsic value of a common share of General by applying the discount to the fair asset value of $5.44, and arrived at a value of $4.08 per share for the common stock of General.

The Vice Chancellor adopted the findings of the appraiser in every particular, but disagreed with him as to the method of arriving at the value of the common share from those findings. He differed with the method of arriving at value used by the appraiser primarily because he was of the opinion that discount "has exclusive application to the question of but one element of value, namely, market value." With this as his premise, he reached the conclusion that the appraiser, in discounting the fair asset value of $5.44, had in fact constructed a market value of the common share, and had committed error when he gave 100% weight to that constructed market value.

The Vice Chancellor was of the opinion that net asset value unaltered by the discount factor must be considered as an independent element of value because it was a value based on mere possession, an important factor when capital appreciation is the principal attraction to the investor. He,

accordingly, felt that constructed market value and net asset value should be fairly weighed in order to determine the value of the shares involved. Recognizing that the weighting of different elements of value necessarily is arbitrary, he gave a weight of 40% to net asset value and a weight of 60% to constructed market value, reaching the conclusion that the value of a common share of General was $4.62.

We do not agree with the Vice Chancellor in this respect for the reason that he has treated "fair asset value" as though it were the same as "net asset value". That they are not the same is apparent when it is considered that fair asset value was arrived at from averages in a normal stock market. Furthermore, the inclusion of the value of the favorable tax position of General necessarily means that "fair asset value" includes elements of value of the common share which could not possibly be included in "net asset value" which necessarily is determined from a mathematical computation of the market values of the portfolio securities.

The 29c item would have accrued to the benefit of the common stockholders of General only after General's management had taken advantage of its favorable tax situation. While the possibility existed, advantage had not been taken of it at the time of the merger. The 29c, therefore, was an entirely hidden and prospective asset. Its inclusion in the fair asset value of the common share was to give effect to the prospect of future advances in the value of the common share, and was to include an element of value which, under no circumstances, could have been reflected in a net asset value, a value fixed by the market price of General's portfolio securities.

These circumstances make it clear to us that the appraiser's fair asset value includes several elements which, in turn, affect the true value of the common shares. It includes "net asset value" and, furthermore, it includes an element of value over and above net asset value which can

only represent the investment possibility of the common stock which the Vice Chancellor refers to as an important element based "on mere possession". It is, therefore, obvious that discounting of the "fair asset value" of General's common stock will not, as the Vice Chancellor held, result in a constructed market value. A constructed market value results only from the discount of net asset value. This must be the fact since discount is fixed by experience in the market, and is nothing more than the average rate of difference between the actual market prices of General's common stock and the net asset value of that stock computed from the basic fact of the market prices of General's portfolio securities.

The dissenting stockholder is entitled to receive the intrinsic value of his share in a going concern. This can mean only that he is entitled to receive that sum which represents the amount he would have received as a stockholder in one way or another as long as the company continued in business. Since we are dealing with a regulated closed-end investment company with leverage from which the stockholder cannot withdraw his proportionate interest, and since dividends on the stock of such companies are of small importance, it follows that the only way in which a common stockholder of a going closed-end company with leverage can obtain the value of his stock is by the sale of it on the market. Furthermore, whenever he seeks to do so, he, by force of circumstances, must sell at a discount, whenever this is an operating element.

The conclusion is, therefore, inescapable that the full value of the corporate assets to the corporation is not the same as the value of those assets to the common stockholder because of the factor of discount. To fail to recognize this conclusion in the valuing of common stock of a regulated closed-end company with leverage is to fail to face the economic facts and to commit error. Discount is an element of value which must be given independent effect in the

valuing of common stock of regulated closed-end investment companies with leverage, and is not confined solely to the construction of a hypothetical market value.

The ultimate value of General's common stock, therefore, is the percentage of the fair asset value which could reasonably be expected, at some time, to have been realized by the common stockholder. The most critical factor to be determined in the fixing of such value is the fair asset value, itself. If it is an amount which contains within it the proportionate interest the common stock has in the assets of the company, the possibility of capital appreciation inherent in the company and the effect of leverage, then fair asset value has been properly determined. Application of the independent element of discount to that amount will give the true or intrinsic value of the common stock of the regulated closed-end investment company with leverage under consideration. The important thing to bear in mind is that value of stock in a going concern is to be measured in terms of ability to realize that value through various media. In the case of General, the only way to realize the common stock value was by the sale of the stock.

We believe that the appraiser was correct in his method of determining value and in the result reached by him. The Vice Chancellor, in weighting as he did fair asset value instead of net asset value, has in effect overbalanced the weight to be given to the element of possible capital appreciation to the extent that he has committed error.

We are asked to apportion costs of this proceeding between the parties rather than against Tri-Continental alone, as was done by the order of the Vice Chancellor. In *Meade v. Pacific Gamble Robinson Co.*, 30 *Del.Ch.* 58 *A.2d* 415, we refused to modify an order for costs unless there was present an abuse of judicial discretion. In the absence of a showing of bad faith on the part of the dissenting stockholders, or a showing that the statutory procedure was made use of for the purpose of being "bought off", we think it

reasonable to tax all costs against the surviving corporation. There is no showing, or hint, of such bad faith on the part of the dissenting stockholders. The order taxing costs will not be disturbed.

A mandate will be entered reversing the order of the Vice Chancellor and directing him to give effect to the valuation of the appraiser.