**Edna POOLE et al., Plaintiffs Below, Appellants,**

**v.**

**N. V. DELI MAATSCHAPPIJ et al., Defendants Below, Appellees.**

Supreme Court of Delaware.

May 27, 1968.

Rehearing Denied June 17, 1968.

---

Clarence W. Taylor and Russell J. Willard, Jr. of Hastings, Taylor & Willard, Wilmington, and Otto E. Koegel, William F. Koegel and David W. Bernstein of Royall, Koegel, Rogers & Wells, New York City, for plaintiffs below, appellants.

Richard F. Corroon of Potter, Anderson & Corroon, Wilmington, and Walston S. Brown of Willkie, Farr, Gallagher, Walton & FitzGibbon, New York City, for defendants below, appellees.

WOLCOTT, C. J., and CAREY and HERRMANN, JJ., sitting.

HERRMANN, Justice:

This case is before us for the second time. It is a suit for inducing a sale of the stock of American Sumatra Tobacco Corporation by fraudulent misrepresentation.

The basic facts establishing the points of reference are set forth in our earlier opinion. See Poole, et al. v. N. V. Deli Maatschappij, et al., Del.Ch., 224 A.2d 260 (1966). As may be seen there, this Court held that the measure of damages in this case is the difference between the true value of the stock and the amount paid therefor by the defendant Deli. We affirmed the Chancery Court's conclusion that the stock is to be evaluated on a going-concern basis and not on a liquidation basis; that the actual or true value of the stock is to be determined by considering the various factors of value including earnings, dividends, market price, assets, and the other factors deemed relevant in a stock evaluation problem arising under the Delaware Corporation Merger Statute, 8 Del.C. § 262. We concluded, however, that the Chancery Court had not properly ascertained the true value of the stock under those standards; that, therefore, it could not ascertain the difference between the price paid for the stock and its true value.

Accordingly, we held that the Chancery Court erred in concluding that the plaintiffs had failed to prove damages and that judgment for the defendants necessarily followed.

Upon remand, the case was resubmitted by the parties to the Chancery Court on the same record, with additional briefs. Again the Trial Court found against the plaintiffs, holding again that they had failed to establish that the value of the stock exceeded the price paid. The crux of the Chancery Court's second decision was as follows:

"The only proof with respect to asset value offered by plaintiffs is their fair market appraisals of the New England and Southern properties. 'Market value' was defined by their experts as 'the highest price estimated in terms of money which a property will bring if exposed for sale in the open market allowing a reasonable time to find a purchaser who buys with knowledge of all the uses to which it is adapted and for which it is capable of being used.' The 'highest and best use' standard was applied by plaintiffs' appraisers who contemplated uses other than agriculture for most of the lands. Defendants' appraisals were made on the same basis. But since determination of asset value is to be made on a going concern basis evidence of fair market or sales value alone does not, in my opinion, establish asset value in the factual situation here involved. What is to be determined is the value of the American Sumatra lands to American Sumatra as a going concern, not what American Sumatra could obtain by selling the lands for uses to which they might otherwise be adaptable. Application of Delaware Racing Association, Del.Ch., 213 A.2d 203. * * *.

\* \* \* \* \* \*

"Since the record is devoid of any evidence showing the going concern asset value of American Sumatra lands, and since determination of the value of a share of American Sumatra stock on the

basis of the remaining relevant factors of value would obviously fail to produce a figure exceeding the price which plaintiffs received, a dismissal of their case is required. * * *."

Upon that basis, the complaint was dismissed, without decision as to the merits of the fraud claim. The plaintiffs appeal.

## I.

The definition of "asset value", as an element of stock value, has been the subject of some confusion among our cases. That the stock itself is to be evaluated upon a going-concern basis has been established beyond question ever since Chicago Corporation v. Munds, 20 Del.Ch. 142, 172 A. 452 (1934); Application of Delaware Racing Association, Del.Ch., 213 A.2d 203 (1965). Not so clear in our cases, however, has been the question of whether the value of the assets of the corporation, when considered as an element of stock value, is to be determined upon a going-concern as opposed to a fair market value [1] basis. For example, *Munds* referred to "net asset value" as a "pertinent consideration" or "standard of measure" in the evaluation of corporate stock; but no definition of the term was provided. In Root v. York Corporation, 29 Del.Ch. 351, 50 A.2d 52 (1946), the Chancery Court stated that the corporation's "net worth, including the value of its assets as a going concern, was an essential element to be considered" in the determination of stock value. A year later, however, in In re General Realty and Utilities Corporation, 29 Del.Ch. 480, 52 A.2d 6 (1947), net asset value was equated with "break-up" value, an obvious reference to fair market or liquidation value of assets.

"Net asset value" was defined by this Court in Tri-Continental v. Battye, 31 Del. Ch. 523, 74 A.2d 71 (1949). There, this

Court affirmed that going-concern value of the stock was the ultimate objective in a stock appraisal; but as to the value of the assets to be considered as an element in determining stock value, this Court stated:

"A great deal of argument in this cause has turned around the phrase 'net asset value' which is simply a mathematical figure representing the total value of the assets of General less the prior claims. * * *

" * * * since the value of dissenting stock is to be fixed on a going-concern basis, the taking of the net asset value as the appraisal value of the stock obviously is precluded by the rule. This is so because, primarily, net asset value is a theoretical liquidating value to which the share would be entitled upon the company going out of business. Its very nature indicates that it is not the value of stock in a going concern.

\* \* \* \* \* \*

"Since, therefore, net asset value is, in reality, a liquidating value, it cannot be made the sole criterion of the measure of the value of the dissenting stock. * * *."

Although thus clearly stated, the meaning of asset value became somewhat clouded again in subsequent cases: In Heller v. Munsingwear, Inc., 33 Del.Ch. 593, 98 A.2d 774 (1953), it was stated that asset value is to be approached from a "going concern point of view, not liquidation." In Sporburg v. City Specialty Stores, 35 Del.Ch. 560, 123 A.2d 121 (1956), it was stated that "assets must be judged on a 'going concern' basis." And in Felder v. Anderson Clayton & Co., 39 Del.Ch. 76, 159 A.2d 278 (1960), it was stated that "asset value is to be determined by finding the going concern value of the assets to the company whose shares are being appraised." See

[1]. Fair market value is defined for present purposes as the price which would be agreed upon by a willing seller and a willing buyer under usual and ordinary circumstances, after consideration of all available uses and purposes, without any compulsion upon the seller to sell or upon the buyer to buy. Compare Wilmington Housing Authority v. Harris, 8 Terry 469, 93 A.2d 518 (1952).

also Levin v. Midland Ross Corp., 41 Del. Ch. 276, 194 A.2d 50 (1963).

■ In Application of Delaware Racing Association, supra, this Court contributed to the confusion by certain dicta which obviously misled the Trial Court in the instant case. In *Delaware Racing,* the appraiser evaluated the land, on which the race track plant was located, on the basis of fair market value for its highest and best use; i. e., residential usage. In arriving at a net land value, the cost of demolishing the racing plant was deducted because the land could not be considered available for residential purposes until cleared. In completing the determination of the value of the assets of the corporation, the appraiser added to the land value thus determined the fair market value of the buildings and structures, computed upon the cost-of-reproduction-less-depreciation method of appraising market value of special purpose structures. See The Appraisal of Real Estate (American Institute of Real Estate Appraisers—1960) pp. 66–73, 126–137, 188–231. The Chancery Court affirmed this basic approach to the evaluation of the assets in *Delaware Racing* [see 206 A.2d 664, 668–669] as did this Court [see 213 A. 2d 209–211]. Thus, fair market value was the test used in the *Delaware Racing Association* case; and the definition of net asset value as stated in the *Tri-Continental* case was not violated. Unfortunately, however, the following dicta crept into our opinion in the *Delaware Racing* case:

"It should be remembered, furthermore, that the value of the land to Steeplechase is its value as the location of a racing plant. Since we are concerned with a going concern value, we think the land value should reflect its value with respect to that going concern, and not with respect to a theoretical use. We accordingly affirm the deduction from land value of the cost of demolition of existing structures."

Obviously, the above conflicts with the rule stated in *Tri-Continental.* There was no

intent in *Delaware Racing* to overrule or modify *Tri-Continental.* We reaffirm the definition of net asset value as a theoretical liquidation value, as stated in *Tri-Continental;* and insofar as the quoted dicta of *Delaware Racing* is in conflict with *Tri-Continental,* it is hereby withdrawn.

Because of the uncertainty apparent in our cases, in adhering to the *Tri-Continental* rule we have reexamined the subject. It appears that the authorities generally regard the fair market value standard as more reliable and workable than the going-concern standard for the determination of asset value.

The concept of going-concern asset value was apparently first developed in the law of condemnation, especially of utilities. 2 Bonbright, Valuation of Properties, 1147. There is a recognized analogy between the law of dissenting-stockholders' appraisals and the law of eminent domain on the subject. 2 Orgel on Valuation Under Eminent Domain (2d Ed.) § 235; 2 Bonbright, Valuation of Properties, 829, f.n. 40.

■ An appraisal of going-concern asset value requires an allowance for an intangible—an addition to or subtraction from the value of the physical property—for the proved capacity or incapacity of the property to operate and to earn. It represents value of the business as distinguished from value of the plant; it involves earning power and financial condition of the corporation; it is often computed by adding or subtracting an allowance based on a certain percentage of the physical valuation. 2 Orgel on Valuation Under Eminent Domain (2d Ed.) 37–44, 120–141, 235–236.

There is little help among the cases as to a proper application of going-concern asset value. In dissenting-stockholders' appraisal cases, there appears to be much "verbiage" which lacks "precision." Annotation: "Valuation of Corporate Stock", 38 A.L.R.2d 442, 461. In rate making cases, going-concern value is said to be on

its "deathbed" because the United States Supreme Court has declined "to give it any meaning that makes its proof even theoretically possible." See 2 Bonbright, Valuation of Properties, 1150, where the author concludes: "One might as well demand proof of the number of angels that can dance on the point of a needle." And as to condemnation cases, it is said that the allowance for going-concern value represents value of the business as distinguished from value of the physical assets, that there is great diversity in the methods of measuring such value, and that because of the extreme difficulty of arriving at a satisfactory method of estimating going-concern asset value, the tribunals have refused to adopt a definite method of computation therefor. 2 Orgel on Valuation Under Eminent Domain, 120–122, 138–139. Going-concern asset value has been described by Justice Frankfurter in a condemnation case as a "compendiously designated * * * portmanteau phrase that needs unpacking." Kimball Laundry Co. v. United States, 338 U.S. 1, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949).

◼ Obviously, going-concern asset value is comparatively an ethereal concept, and the appraisal thereof is a highly speculative and conjectural process. We are satisfied that fair market value, so well formulated in the law of eminent domain, furnishes a more concrete and workable rule for appraisers, lawyers, and judges. Any allowance for earning power of the assets or value of the business, deemed necessary under the circumstances of a given case, is best left to the court's consideration of earnings as an independent element of stock value and to the court's exercise of the weighting function.

The view we take is in accord with that stated at 15 Fletcher, Cyclopedia Corporations (Perm.Ed.) 305:

"Net asset value is entitled to weight, but it must be remembered that an appraisal is not a liquidation, and that the stock must be appraised on a going concern basis with the possibility in different cases that the value of the stock may be substantially above or below net asset or break-up value. The nature of the business, the nature of the assets, their liquidity, and profitable use, are factors bearing upon the weight to be given to net asset value."

## II.

Therefore, although we well understand the source of its difficulty, we must hold that the Trial Court erred in its conclusion that going-concern asset value is the measure in this case. But that conclusion does not mean that we reach an opposite result.

We have reviewed the facts and the law of the case. Nardo v. Nardo, Del., 209 A.2d 905 (1965); Application of Delaware Racing Association, supra. Applying to the undisputed evidence in the case the fair market value standard, we reach the same conclusion as did the Trial Court: there is no sufficient evidence to prove that the true value of the stock exceeded the price paid for it.

American Sumatra's business was the growing of tobacco. It owned approximately 30,000 acres of land in Georgia and Florida, constituting the Southern Properties, used for growing timber and general farming purposes. It also owned approximately 5,000 acres of land in Connecticut and Massachusetts, constituting the New England Properties, of which approximately 1,200 acres were used for tobacco-growing, and the rest for agricultural and industrial purposes. The appraisal experts presented by the plaintiffs testified that if sold off over a period of five or more years, the Southern Properties could be expected to bring gross sales prices of $5,281,312. and the New England Properties $9,141,300., a total of $14,422,312. Expert testimony adduced by the defendants was to the same effect generally: if sold piecemeal over a five year period, the properties could be expected to produce a gross sum of approximately $14,000,000. The spread of sales over a period of years was deemed expedi-

ent in view of the magnitude and nature of the holdings.

■ The difficulty with such approach is that, in and of itself, it does not produce fair market value of the assets as of the Summer of 1960 when the offer to buy the plaintiffs' stock was made by Deli and acted upon by the plaintiffs. An evaluation of assets such as this must bear a definite relationship to a focal point of time. For example, in a condemnation case, market value is ascertained as of the date of the taking; in a merger case, market value is determined as of the date of the merger; so here, to be useful for present purposes, the evaluation of assets must be as of the time when the tender-offer was made.

Obviously, property values as of five or more years thereafter can be of no consequence for present purposes unless adjusted and related back to the focal period in a reasonable manner to reflect what a willing buyer would have paid for the properties in the Summer of 1960. It follows that all of the plaintiffs' appraisals in the instant case, premised solely upon liquidation of the properties five or more years afterwards without necessary adjustments, were irrelevant and could not support a finding of asset value, as of the time of the tender-offer, sufficient to constitute an element of stock value in this case.

The only evidence in this case upon which a finding of asset fair market value as of the time of the tender-offer could have been predicated, was the evidence presented by the defendants' expert witness Ohland Liessmann. He concluded that the fair market value of the assets, as of the Summer of 1960,[2] was $7,576,981. This was based on gross proceeds of approximately $14,000,000. which it was agreed could be obtained from a liquidation of the assets over a period of five years. Mr. Liessmann then discounted that figure for real estate taxes, realtors' commissions, insurance premiums, and other expenses of carrying and selling the properties during the five year period. Present worth factors were then applied to determine what an investor would have been willing to pay for the properties in the Summer of 1960. This appraisal approach is a generally approved appraisal technique. The result, in the opinion of this expert, was $7,576,981., or $22.40 per share as the net asset value of the stock.

We are of the opinion that this was the only proper approach to the problem taken in this case. It produced an estimate of the amount an investor would have been willing to pay for the properties in the Summer of 1960, in anticipation of profits over a period of years thereafter. This may be said to equate fair market value of the properties as of that time—the factor being sought.

■ Thus, Mr. Liessmann's approach was the only evidence in the case upon the basis of which, in our opinion, the plaintiffs could have possibly prevailed. But even that evidence is not sufficient to save the plaintiffs' case. Adopting all of the other values and weightings now urged by the plaintiffs, and applying Mr. Liessmann's net asset value figure of $22.40 per share, the following is the result:

| | |
|---|---|
| Asset Value ($22.40 x 50%) | $ 11.20 |
| Market Value ($14.69 x 25%) | 3.67 |
| Earnings Value ($4.20 x 25%) | 1.05 |
| True Value | $ 15.92 |

The tender-offer was $17.00 per share. Adopting the above values and weightings as the best face that can be put on the plaintiffs' case under the law and the evidence as we see it, we must conclude, as did the Chancery Court, that the plaintiffs have failed to prove that the offer of $17.00 per share was less than the true value of the stock.

Accordingly, the judgment below is affirmed.

2. Assuming a maximum period of one year after June 10, 1960 for the consummation of a sale.

ON MOTION FOR REARGUMENT

The plaintiffs assert that we err in making the statement: "The appraisal experts presented by the plaintiffs testified that if sold off over a period of five or more years, the Southern Properties could be expected to bring gross sales prices of $5,281,312. and the New England Properties $9,141,300., a total of $14,422,312." The plaintiffs assert that this is manifest error because their expert witnesses "irrefutably" determined fair market value as of June 1960.

In view of the vehemence of the plaintiffs' assertions, it is deemed advisable to document the above statement:

Mr. Louis Lavitt, the plaintiffs' appraiser as to the New England Properties, testified:

"Q Mr. Lavitt, in your opinion how long would it require American Sumatra to realize $9,141,300 for its real estate in the Connecticut Valley?

"A I would say perhaps five years. It might be a considerably shorter time, but if I were to arbitrarily take a figure of a period of time that I thought it would be safe to assume that this property could be disposed of at these figures, I would want five years."

Mr. Richard Tift, the plaintiffs' appraiser as to the Southern Properties, testified regarding the statement contained in his written appraisal report admitted in evidence: "Estimated liquidation time: 100% in five years or 2.5 year average." He testified:

"Q This means, I think you agreed, that the two and a half year average estimated liquidation time means that you sell 50% of the property in your first two and a half years, and 50% in the second two and a half years?

"A Yes."

And Mr. John H. Neeley, another appraisal witness called by the plaintiffs regarding the Southern Properties, testified:

"Q I believe you testified that it would take five years to dispose of these properties that your testimony covered, in order to realize the $5,278,000 which you say it is worth?

"A Yes, sir. I am convinced it would take at least that time.

"Q Is it possible that it might take more than five years to realize those appraisals?

"A I can only—educated guessing on time, my opinion is that it could be done in five years. Possibly it would take longer."

*   *   *   *   *   *

"Q So as I understand your appraisal [ * * * ] it is that if this land were sold over a period of five, and perhaps more years, it is your opinion that over that period of time the proceeds of the sale of all the land would be approximately five and a quarter million dollars?

"A That's correct.

"Q Starting on June 10, 1960?

"A Yes, sir."

We note the plaintiffs' alternative request for leave to open the case below for the purpose of introducing evidence to conform to the rulings contained herein. Such application may be addressed to the discretion of the Chancery Court under its Rule 60(b), Del.C.Ann. Compare 7 Moore's Federal Practice ¶ 60.30[2], pp. 338–340.

The motion for reargument is denied.