Edith K. BELL et al., Petitioners,

v.

KIRBY LUMBER CORPORATION,
Respondent.

Court of Chancery of Delaware,
New Castle.

Submitted April 17, 1978.
Decided Oct. 18, 1978.

Richard F. Corroon, and James F. Burnett, of Potter, Anderson, & Corroon, Wilmington, for petitioners.

William O. LaMotte, III, and A. Gilchrist Sparks, III, of Morris, Nichols, Arsht & Tunnell, Wilmington, for respondent.

BROWN, Vice Chancellor.

This is a decision on the exceptions taken by certain stockholders ("the stockholders") as well as those taken by the resulting corporation, Kirby Lumber Corporation ("Kirby") to the final report of an appraiser which determined the value of shares held by stockholders dissenting from a merger.

Kirby is a Delaware corporation founded in 1901. Its business since that time has been to convert its timber resources into lumber and plywood for purposes of sale. In 1936, as a result of a reorganization in bankruptcy, a subsidiary of The Atchison, Topeka and Santa Fe Railway Company acquired 60 per cent of the outstanding stock of Kirby. Additional purchases of Kirby stock over the years increased this majority holding to some 88 per cent by 1967. As a result of corporate restructuring in 1971, Kirby became a partly-owned subsidiary of Santa Fe Natural Resources, Inc., which in turn is a wholly-owned subsidiary of Santa Fe Industries, Inc. ("Santa Fe"). Through continued purchases, Santa Fe Natural Resources, Inc. owned approximately 95 per cent of the outstanding stock of Kirby by 1973.

In the fall of 1973 Santa Fe's management decided to investigate the feasibility of acquiring all the remaining minority stock of Kirby. To this end, Santa Fe sought to obtain an appraisal of Kirby's business and assets and eventually, after evaluating several candidates, it selected one W. D. Davis of the firm of Appraisal Associates, to make this asset appraisal. At or about the same time Santa Fe retained the investment banking firm of Morgan Stanley & Company, Incorporated ("Morgan Stanley") to furnish an opinion as to the fair market value of the Kirby minority shares.

As a result of the various evaluations and reports, Santa Fe determined to effect a short form merger of Kirby pursuant to 8 Del.C. § 253 under the terms of which the minority stockholders of Kirby would be eliminated from the surviving corporate entity in return for a payment of cash for their Kirby shares. To accomplish this, Santa Fe Natural Resources, Inc. caused the incorporation of Forest Products, Inc. ("F.P.I."), a Delaware Corporation. F.P.I. then became the parent corporation of Kirby through the issuance of 1,000 shares of the capital stock of F.P.I. to Santa Fe Natural Resources, Inc. in exchange for its 95 per cent issued and outstanding stock of Kirby. On July 30, 1974, the F.P.I. board adopted a resolution of merger pursuant to § 253 providing that F.P.I. would be merged into Kirby with Kirby surviving, and that each share of Kirby stock not owned by F.P.I. would have the right to receive $150 per share in cash in exchange therefor, or, alternatively, the right to seek an appraisal under § 262 of the Delaware General Corporation Law. Santa Fe Natural Resources, Inc., as F.P.I.'s sole stockholder, approved the merger on this same date, and it became effective July 31, 1974. The petitioning stockholders here, being the owners of some 4,000 Kirby shares, dissented and thereafter demanded and qualified for an appraisal under § 262.

Subsequently, extensive discovery was entered into by the parties and a lengthy evidentiary hearing was held before the appraiser appointed by the Court. Post-hearing memoranda were also submitted to the Appraiser, and, after a draft of his findings was first submitted to the parties, his final report was filed with the Court. Neither Kirby nor the stockholders were content with the conclusions of the Appraiser, and accordingly the present exceptions have been filed, briefed and argued. This is the decision thereon.

At the outset, it seems appropriate to set forth the parameters of disagreement before turning to the particulars on which the parties rely in support of their respective contentions. The conclusion of the Appraiser in arriving at a value for the Kirby shares as of July 31, 1974, is as follows:

| | | |
|---|---|---|
| Earnings | $120 x 60% | $ 72.00 |
| Assets | $456 x 40% | 182.40 |
| Value per share | | $254.40 |

The valuation urged by the dissenting stockholders is as follows:

| | | |
|---|---|---|
| Earnings | $252 x 10% | $ 25.20 |
| Assets | $682 x 90% | 613.80 |
| Value per share | | $639.00 |

The alternate valuation deemed appropriate by Kirby is as follows:

| | | |
|---|---|---|
| Market | $125 x 55% | $ 68.75 |
| Earnings | $109 x 40% | 43.60 |
| Assets | $456 x 5% | 22.80 |
| Value per share | | $135.15 |

—— or ——

| | | |
|---|---|---|
| Earnings | $109 x 95% | $103.55 |
| Assets | $456 x 5% | 22.80 |
| Value per share | | $126.35 |

A glance at these computations makes it clear that the area of greatest disagreement lies in the value attributed to Kirby's assets and, even more so, in the weight to be assigned to this asset value element in order to arrive at a fair value for a share of Kirby stock as of the date of the merger. This factor as well as the wide disparity which is conceded by all to exist between asset value and earnings value, warrants a brief explanatory background.

As noted previously, Kirby is, and always has been, in the lumber business. It owns more than 557,000 acres of forest land located in eastern Texas and southwestern Louisiana (a total area almost one-half of the size of the State of Delaware.) As of the time of the merger Kirby owned and operated both a sawmill and a plywood plant in Silsbee, Texas. Also at the time of the merger it had under construction a new plywood plant at Bon Weir, Texas, and a particleboard plant in Silsbee, both scheduled to be completed and operational by late 1974 or early 1975. It also operated a small wood manufacturing facility in Cleveland, Texas.

Pursuant to its forestry plan in operation at the time of the merger, Kirby was harvesting its timber resources on a "sustained yield basis." This means that it harvests and processes its trees at approximately the same rate at which its timber base grows, thus maintaining a constant source of timber reserves. Historically its earnings have come from the sale of the products yielded from its timber by its manufacturing operations. For most of its history, Kirby manufactured dimension lumber and railroad ties. Starting several years before the merger, however, Kirby's management took a more aggressive view toward the use of its resource base. Stated simply, it foresaw larger profits from increased emphasis on plywood production as well as from its own processing of residuary materials which it had formerly disposed of through others. Thus the decision to construct the particleboard plant and the additional plywood plant.

It is the status brought about by this method of operation by Kirby which produces the widely divergent views of the parties as to the intrinsic value of the Kirby stock. The stockholders point to the vast natural resource assets of Kirby and take the position that it is there that the true value of the stock is to be found. Kirby contends, however, that this asset value comes into play only in the event of a liquidation or sale of assets, neither of which is contemplated as evidenced by the prevailing diversification policy of the parent, Santa Fe, and by the construction of the new manufacturing facilities. Accordingly, Kirby contends that the value of its shares at a given time derives from the success of its manufacturing operations for which the timber acreage provides only a sustained-yield base. Thus, Kirby would have earnings control the valuation of its stock while the stockholders, with equal vigor, would have the Court look almost solely to the value of the assets.

With this underlying major point of dispute in mind, I turn to the issues raised by this exceptions proceeding. While they ap-

pear to be numerous, I feel that they can be reduced to five basic areas of contention. From the standpoint of the stockholders, they contend that the Appraiser erred by refusing to value the Kirby stock on the basis of the amount that all Kirby shareholders, including Santa Fe's interests, would have received in a merger negotiated at arms length with a third party. In addition, they contend that the Appraiser erred in refusing to give consideration to the asset appraisal performed by W. D. Davis at the request of Santa Fe and in accepting, instead, with minor adjustment, the asset appraisal of R. L. Nichols made at the request of Kirby after the merger expressly for use in this appraisal proceeding. As a corollary to this argument, the stockholders argue that Kirby is estopped from attacking the Davis appraisal in this proceeding. Finally, both parties dispute the earnings value reached by the Appraiser as well as his decision to weight asset value at 40 per cent and earnings value at 60 per cent. I deal with these issues in the order set forth.

### I. *The Basis For Valuing The Shares.*

█ On this point the stockholders charge that the Appraiser closed his eyes to the realities of the situation, namely, that Kirby is a natural resource company. They concede that in valuing an ordinary manufacturing company, current and prospective earnings are of significant interest because essentially this is the only way such a corporation can generate a return on investment. They contend, however, that natural resource companies are not bought and sold on the basis of their earnings records. Rather, they feel that the controlling factor in the purchase or sale of a natural resource company is the value inherent in the corporation's assets. They say that this is particularly true where the resource is timber since, unlike mineral resources such as coal and oil, timber grows and thus can be replenished.

Experts offered by the stockholders testified that based upon market figures it appeared at the time of the merger that investors were willing to invest in natural resources companies at an interest return of about 2 per cent per year. Stated another way, there was evidence that in the period immediately prior to the merger companies with substantial timber assets were being sold at fifty times their current earnings, thus indicating that the price paid by investors in forest product companies was based upon factors other than current earnings.

The stockholders charge that Santa Fe was fully cognizant of this overriding asset value feature when it made its decision to buy in Kirby's 5 per cent minority interest. There was an indication at the time that Kirby's timber assets were increasing in size at the rate of 7.2 per cent per annum and had increased in market value by more than 50 per cent over the preceding four calendar years. Santa Fe's view is framed in the following excerpt from its management's analysis of the economic feasibility of the merger:

"The question is whether it is worth $3.75—$10 million to Santa Fe Industries to own 100% of the Kirby stock. Put another way, is it worth that amount to acquire the remaining 5% in an asset that is valued at $335 million."

The stockholders say that in Delaware stock appraisal decisions there is no precedent regarding the appropriate approach to be taken in the appraisal of the stock of a natural resource company. Therefore, they contend that the Appraiser, not being bound by any precedent, should have viewed the situation as did the parties and valued their stock interests primarily on the basis of their proportionate share in the asset value of Kirby.

As to the legal theory to support this approach, the stockholders rely on the recent decisions in *Singer v. Magnavox Co.,* Del.Supr., 380 A.2d 969 (1977) and *Tanzer v. International General Industries, Inc.,* Del. Supr., 379 A.2d 1121 (1977). The stockholders emphasize that although the main thrust of these decisions was that a majority shareholder may not cause a merger solely to cash-out minority stockholders, the Supreme Court in reemphasizing the fiduciary duty owed by the majority to the mi-

nority, went on to state that "in any event, a *bona fide* purpose notwithstanding, [the majority shareholder] must be prepared to show that it has met its duty . . . of 'entire fairness' to the minority." *Tanzer v. International General Industries, Inc., supra*, 379 A.2d at 1124. The stockholders thus argue that this fiduciary duty of fairness owed by the majority must also be enforced in the context of an appraisal action.

To illustrate that the majority, as controlled by Santa Fe, has not fulfilled that fiduciary duty here in offering $150 per share for Kirby's minority interest, the stockholders make a simply argument. Specifically, they point to the fact that Santa Fe assumed that Kirby's asset value was well over $300 million which, divided by its total of 500,000 outstanding shares, would make each share worth more than $600 in the event that the corporation was sold or merged with another in an arm's-length transaction. Stated another way, if Santa Fe had decided to dispose of its 95 per cent interest as of the date of the merger, it surely would not have done so at $150 per share. Similarly, it would have been an unlawful violation of the majority's duty to sell the assets of Kirby to another Santa Fe subsidiary at a price of $75 million ($150 × 500,000 shares) when it had reason to believe that Kirby's asset value was in excess of $300 million. Ergo, Santa Fe cannot have fulfilled its fiduciary duty to the minority by offering the $150 per share to eliminate them from the corporate enterprise.

To avoid what the stockholders view to be this gross inequity, they urge that in valuing their interests in the unusual situation brought about by Kirby's status as a natural resource company, the Appraiser should have fixed a price which assumes that Santa Fe had instead chosen to divest the minority of its interest in Kirby by the alternative method which would have been most beneficial to the minority, and which would have resulted in equal treatment for both majority and minority shareholders i. e., a theoretical arm's-length merger with an unrelated corporation. While I appreci-

ate the logic of this argument when viewed from the position of a minority shareholder, I cannot conclude that the Appraiser erred in refusing to honor it. I say this because even though there may be no Delaware precedent dealing strictly with a natural resource company such as Kirby, there is also nothing in the precedents, as I read them, which would authorize this Court to depart from the general rules developed to govern appraisal proceedings simply because of the nature of the corporate enterprise.

█ In *Tri-Continental Corporation v. Battye*, Del.Supr., 31 Del.Ch. 523, 74 A.2d 71, 72 (1950) it was held as follows:

"The basic concept of value under the appraisal statute is that the stockholder is entitled to be paid for that which has been taken from him, viz., his proportionate interest in a going concern."

And at 74 A.2d 76 it was reiterated that:

"The dissenting stockholder is entitled to receive the intrinsic value of his shares in a going concern. This can only mean that he is entitled to receive that sum which represents the amount he would have received as a stockholder in one way or another as long as the company continued in business."

Since value must be fixed on a going-concern basis, the liquidating value of the stock may not be accepted as the sole measure. Rather, all relevant factors must be considered. *Tri-Continental Corporation v. Battye, supra* ; *Sterling v. Mayflower Hotel Corp.*, Del.Supr., 33 Del.Ch. 293, 93 A.2d 107 (1952); *Poole v. N. V. Deli Maatschappij*, Del.Supr., 243 A.2d 67 (1968); *In re Olivetti Underwood Corporation*, Del.Ch., 246 A.2d 800 (1968).

The "arms length merger" approach urged by the stockholders here recognizes that their stock cannot be appraised solely upon the liquidating value of Kirby's assets. Thus they shy away from a sale of assets approach. Yet they also seem to go beyond the "going concern" standard firmly established by the above cases. Boiled down, their argument appears to be that because

Kirby is a natural resource company with an asset value admittedly far above either its earnings or constructed market value, their proportionate interest should be determined based upon the reasonable *going-concern value* that the corporation would have had *for the purpose of an arm's-length merger* with a third party, divided by the number of outstanding shares.

But if *Tri-Continental Corporation v. Battye, supra,* tells us that "going concern" means "as long as the company continued in business," 74 A.2d 76, then this concept fails since an arm's-length merger presupposes an acquisition value based upon the very fact that the company will not continue in business on the same basis that existed immediately prior to the merger. It introduces another element, namely, the *value* another would place upon it as a price for merger as opposed to the corporation's independent value as a going concern. Accordingly, I conclude that the Appraiser did not commit error in refusing to apply the valuation standard urged by the stockholders.

## II. *The Davis Versus The Nichols Asset Appraisal*

■ As noted previously, Santa Fe retained the services of W. D. Davis, a partner in the Kansas City firm of Appraisal Associates, for the purpose of obtaining a value opinion of the assets of Kirby prior to the time of the merger. The assets to be valued, among other things, were the several Kirby plant sites, its equipment, the land, the merchantable timber (or stumpage) then on the land, and the plantation acreage (or land which had been clear-cut and then systematically planted with seedling trees). There seems to be no dispute that Davis, based upon his years of experience and professional credentials, was well qualified to make such an asset appraisal. Indeed, Santa Fe selected him only after interviewing or otherwise screening various other applicants for the job.

Davis investigated the Kirby situation over a period of some four months (although apparently not to the exclusion of all else) and as a result reached an asset

value conclusion of $320 million. In reaching his conclusion, Davis attacked the problem in three different ways which he labeled (1) the Cost Approach, (2) the Earnings Approach, and (3) the Direct Sales Comparison Approach. I find it unnecessary here to delve into the various elements and details relied upon by Davis in these separate analyses. It is important to note, however, as did the Appraiser and as did I from a review of the hearing transcript, that the three approaches employed by Davis were not independent of each other, but rather that the conclusion reached in each derives in one way or another from Davis's going-concern analyses of two separate and time-related lumber company transactions, namely the sale of assets by Tremont Lumber Company to Crown Zellerbach and Lehman Brothers in 1973 and the merger of Temple Industries into Time, Inc., also in 1973. The Temple transaction was deemed particularly significant since certain of its forest lands had been contiguous to those of Kirby.

Davis's approach to his analysis of both the Temple and the Tremont transactions was to begin with the total consideration paid for the acquisition of each (the purchase price in the case of the Tremont sale of assets and the overall value flowing to Temple as a result of the exchange of Time, Inc. stock for Temple stock in the Temple-Time, Inc. merger), and then to assign and subtract therefrom values for all assets other than land and timber. His resulting figure gave him a value for the land and timber. He then proceeded to establish a value for the land from various comparables, and subtracted the total amount. The sum thus remaining was assumed to be the value of the timber. He then translated this figure in each case into unit prices per cord or thousand board feet, which he in turn transferred and applied to the known timber inventory of Kirby so as to place a value on its stumpage.

As the Appraiser noted, however, by employing this method, i. e., to deduct all liabilities and assets other than land and timber from the total consideration for the

Tremont and Temple transactions and to thereafter eliminate a value for the land so as to accept the resulting figure as the value of the Tremont and Temple stumpage, Davis failed to factor out or give any credit to the going concern value that of necessity had to be included in the price that both Crown Zellerbach and Time, Inc. were either willing or required to pay in each case to acquire an ongoing lumber company operation. To the extent that Davis offered a reason for failing to do so in the Tremont transaction, the Appraiser deemed it unpersuasive since it was based upon Davis's subjective opinion as to the thinking of Crown Zellerbach without any attempt to ascertain the facts.

The Appraiser also concluded, reasonably I think, that in certain instances Davis deliberately make adjustments which seem explainable only by a propensity to arrive at a compatible end figure. The appraiser also found numerous arithmetical errors in the Davis Appraisal, and saw fit to append a list of 73 such errors to his final report together with the comment that "[d]oubtless, there were more." I further note that having arrived at an end figure by his earnings approach Davis made a substantial "judgment" adjustment upward—and with his cost approach a $20 million adjustment downward—so as to cause both to compare favorably with his direct sales comparison analysis.

Based upon the foregoing, the Appraiser declined to give any evidentiary weight to the Davis asset appraisal. I cannot say that he erred in so doing. No doubt the Davis appraisal may have been of value for some purposes, but in light of *Poole v. N. V. Deli Maatschappij, supra,* which holds that in stock appraisal cases asset value must be based on the fair market value of the assets at the time of the merger free from any going concern value attributable thereto, and in view of the other factors mentioned by the appraiser, I cannot find fault in his decision to totally reject it for the purpose of his proceeding.

Since the stockholders' other expert witness on asset value, Mr. Humes of the Gir-ard Bank in Philadelphia, based his testimony primarily upon the findings and conclusions of the Davis appraisal, it follows, as the Appraiser held, that his testimony too was without benefit for the purpose of the Appraiser's task. It is significant to note, however, that Humes himself viewed the Davis effort as a "going concern" appraisal.

■ As to the asset appraisal of R. L. Nichols, the Appraiser found it to be reliable, and I can find no reason to quarrel with this decision on his part. Nichols also used the Temple and Tremont transaction as comparables. However, he factored out an amount for the going concern value involved in them. Also, based upon evidence that at least ten years would be a reasonable time required to harvest and sell all timber, or stumpage, on the Kirby tract as of the date of the merger, and computing therein a 6 per cent to 7 per cent increasing growth factor over that period, Nichols found a value for total sales over the ten year period and reduced it to present worth as of the date of the merger so as to ascribe a liquidation value to the stumpage as of that date. This appears to be in compliance with the method approved in *Poole v. N. V. Deli Maatschappij, supra.* It also appears to be something that Davis did not do in his asset appraisal.

Since the Appraiser's reasonable rejection of the Davis appraisal left only the Nichols appraisal before him, and since the Nichols' appraisal, in its approach, seemed to follow the guidelines previously approved by our Supreme Court, I find no error in the Appraiser's reliance upon it. Therefore, I approve his decision to value assets at $456 per share as of the date of the merger.

### III. *The Stockholders' Estoppel Argument*

■ As noted previously, the appraisal of W. D. Davis was obtained by Santa Fe prior to the formulization of the merger and in preparation therefor. Davis rendered his opinion in early 1974 as to the value of Kirby's assets as of December 31, 1973. The short-form merger took place on July 31, 1974. Following the merger Kirby

mailed an Information Statement to all minority shareholders notifying them of the merger, advising them of the price fixed by Santa Fe and of their right to an appraisal under Delaware Law, and providing them with information which they might use in deciding whether or not to seek an appraisal. Included was a summary of the Davis value conclusions. Concerning this and other valuation materials, the Information Statement stated as follows:

"This Information Statement sets forth a description of the merger and includes information concerning Kirby, its business and properties together with earnings and financial statements and *the results of certain appraisals* made respecting Kirby. *Each of the Minority Stockholders of Kirby is urged to read this material carefully in making his or her determination to seek or not to seek an appraisal* pursuant to the Delaware Law." (Emphasis added.)

The stockholders argue that the summary of the Davis asset appraisal thus forwarded to them revealed a potential per share value of Kirby stock far in excess of $600, and thus, being a professional appraisal obtained and paid for by Kirby at considerable expense, and being one to which Kirby apparently had no objection, it caused them to decide to engage in "expensive and lengthy proceeding" to seek a court-appraisal of their stock rather than to accept the $150 merger price. Accordingly, they say that they have incurred a legal detriment in reliance on the Davis report provided them by Kirby and that as a consequence Kirby should be estopped from challenging the reliability of the Davis report in the very proceeding which the report convinced them to initiate.

Admittedly, this is a troublesome point. However, I am convinced that Kirby is not estopped from disowning the Davis report for the purpose of this proceeding.

■ The Appraiser rejected the estoppel argument for two reasons. First, he noted that the Information Statement simply represented that Appraisal Associates, through Davis, had made an appraisal. It was not

misdescribed and later it was used extensively by the stockholders in presenting their case. Under the duty of complete candor imposed on a majority stockholder, see *Lynch v. Vickers Energy Corp.*, Del. Supr., 383 A.2d 278 (1977), Kirby undoubtedly had a duty to disclose the existence of the Davis report. The Appraiser felt, however, that the fulfillment of this obligation was not synonymous with an assumption that Kirby had unequivocally adopted the report as being accurate for the purpose of an appraisal proceeding in the event that one might be thereafter instituted.

■ Secondly, the Appraiser felt that in any event, in carrying out his duty to make a valuation of the stock, he was not bound to accept the conclusions of the Davis report regardless of what the parties might be bound by estoppel to accept. I am in agreement with this second point, at least under the facts of this case.

■ In *In re General Realty & Utilities Corporation*, Del.Ch., 29 Del.Ch. 480, 52 A.2d 6 (1947) it was noted that the "appraisal statute gives the Appraiser great latitude in seeking evidence from which he may ascertain the value of the shares to be appraised." Thus it would seem that an appraiser would have the power to call for an independent appraisal of a particular aspect of corporate business if he did not feel those offered by the parties to be trustworthy for one reason or another. This being true, there would be no justification in limiting him to a single appraisal offered by one side simply because of the other side estopped from attacking it. Thus, if estoppel cannot effectively limit an appraiser to one value appraisal, then the source of additional appraisals should not be the controlling feature. The weight to be given to conflicting appraisals attributable to the same party, as well as the motivations going into such a conflicting offer, should indeed by subjected to close scrutiny by an appraiser appointed pursuant to § 262. However, in a § 262 proceeding, because of its purpose of placing a true, intrinsic value on shares of corporate stock, the appraiser

should not be deprived by act of the parties of the opportunity to consider materials which he feels to be relevant.

The point is amply illustrated here. The Davis asset appraisal was found to be without value by the Appraiser in light of the Delaware case decisions which governed his function. I have previously agreed with his reasoning. But if the stockholders' position is accepted, the final result of this proceeding would nonetheless be required to be governed by an improper standard solely because both the corporation and the dissenting stockholders, at a point in time, chose to rely upon it.

This, in turn, points to several other factors. First, although being aware of its intended use by Kirby well in advance of the hearing, the stockholders apparently made no objection to the introduction of the Nichols appraisal and consequently, under the general rules applicable to the defense of estoppel in an adversary proceeding, any right they had to confine the evidence to the Davis appraisal can arguably be said to have been waived. 28 *Am.Jur.2d*, Estoppel & Waiver § 135; 31 *C.J.S.*, Estoppel § 153(4). Secondly, there is nothing in the record to establish that the stockholders would not have sought an appraisal under § 262 but for the general reference to the Davis report in the Information Statement. Finally, to the extent that the Appraiser has recommended an increase in the merger price from $150 to $254.40 per share, their change in position, even if made solely in reliance on the Davis appraisal, does not seem to have been to their detriment.

I affirm the Appraiser's decision that Kirby was not estopped to disavow the Davis report for the purpose of this proceeding.

### IV. *The Appraiser's Valuation of Earnings*

The Appraiser adopted the approach of Charles C. Townsend, managing director of Morgan Stanley, in arriving at an earnings valuation. On this aspect of the matter, his report reads as follows:

"To find a proper price earnings ratio, a list of companies most comparable to Kirby was compiled. Factors considered in selecting the proper P/E included average pay out ratios, Kirby's partially completed capital program, historical and projected earnings, appraised asset value, and the quality of Kirby's management, which was deemed 'aggressive.' Based upon these factors, Morgan Stanley selected as appropriate for Kirby a price earnings ratio of 15.2x. This ratio is slightly below the 16.8x for Georgia Pacific and well below the 23.5x for Weyerhauser, but is above the 13.8x for average comparable companies. The ratio thus derived was multiplied times the average earnings per share for the previous five years ($7.92) and results in an earnings value of $120 per share."

In adopting this $120 earnings value, the Appraiser noted that the methodology employed by Townsend was an approved one. *Universal City Studios v. Francis I. duPont & Co.*, Del.Supr., 334 A.2d 216 (1975). See also, *Gibbons v. Schenley Industries, Inc.*, Del.Ch., 339 A.2d 460 (1975).

The stockholders argue that it was unrealistic to use Kirby's latest five-year earnings record in view of the fact that the merger was accomplished just before the completion of the new plywood and particleboard plants and thus at a time just before Kirby, by its own admission was projecting a "phenomenal" increase in future income. They say that the realistic outlook as to Kirby's future prospects warranted the use of earnings for only the one full year preceding the merger, that being $12.00 per share. The stockholders argue that the multiplier should have been based on the five-year average prices of the comparable companies rather than their price on the date of the merger. This would have revealed a ratio for Georgia Pacific of 21.9x, a ratio for Weyerhauser of 27.9x, and a group multiple of 19.3x. Accordingly, they argue that 21x would have been an appropriate multiplier for Kirby and that earnings should have been valued at $252 per share ($12.00 × 21), or, at the very least, $166 ($7.92 × 21).

However, it was held in *Francis I. duPont & Co. v. Universal City Studios, Inc.,* Del. Ch., 312 A.2d 344 (1973), *aff'd., Universal City Studios, Inc. v. Francis I. duPont & Co., supra,* that the fact that the trend in annual earnings was on a steady rise during the five years preceding the merger "is not a reason in law" for abandoning the averaging approach or for eliminating any one year as isolated or unusual. It would seem that the same rationale would apply to focusing on any one year preceding the merger. See, *Sporborg v. City Speciality Stores,* Del.Ch., 123 A.2d 121 (1956).

As to the multiplier of 15.2x adopted by the Appraiser, the precedents hold that his determination of a multiplier will not be disturbed as long as it is "within the range of reason," *Heller v. Munsingwear, Inc.,* Del.Ch., 33 Del.Ch. 593, 98 A.2d 774 (1953); *Felder v. Anderson, Clayton & Co.,* Del.Ch., 159 A.2d 278 (1960). The application of a multiplier to average earnings in order to capitalize them "lies within the realm of judgment. There is no hard and fast rule to govern the selection." *Application of Delaware Racing Association,* Del.Supr., 213 A.2d 203, 213 (1965). On the evidence, I find the multiplier used to be within the range of reason and I will not alter it.

### V. *The Weighting Factors*

As noted at the outset, the Appraiser assigned 60 per cent weight to the earnings value of $120 per share found by him and 40 per cent weight to ascertained asset value of $456 per share. Both Kirby and the stockholders take issue with the weight assigned to assets. The stockholders would assign 90 percent to this element while Kirby urges 5 per cent.

In arriving at his determination, the Appraiser took into consideration that Kirby's 5 per cent minority stockholders were "locked in" and that without a sale of assets, liquidation or merger they in all probability could not have received more than $90–$100 for their shares. (Indeed, the highest market price paid for Kirby shares in the several years prior to the merger was $92.50, and this represented acquisitions made on behalf of Santa Fe.) He noted the large disparity between the market value of assets and earnings value, but he also noted that such disparity was not unique to Kirby but rather it was similar to that which existed in many natural resources companies at the time, including the comparables offered by Morgan Stanley. From the evidence he also accepted the inference that an immediate market for Kirby's assets could have been found had a sale been desired, although on the evidence it was equally inferable that Kirby had no prospect of being sold by Santa Fe in the near future and that its business would be carried on basically in the same manner that it had been carried on for decades, i. e., utilizing its timber resources on a sustained-yield basis for the purpose of manufacturing and selling lumber products.

Having considered the evidentiary record and the exhaustive and comprehensive arguments and authorities offered by the parties, I find myself in a position wherein I can find no solid justification for deviating from the weightings assigned by the Appraiser. There are arguments pro and con as in any question of valuation. I recognize the stockholders' argument that in *Swanton v. State Guaranty Corporation,* Del.Ch., 215 A.2d 242 (1965) the Chancellor weighted assets at 60 per cent because of the corporate policy to acquire land for the purpose of realizing on its eventual appreciation in value. But while Kirby's lands and forests continue to appreciate in value here, the distinction is that such assets were not acquired and held solely to appreciate in value, but rather to provide the materials for its manufacturing operations from which substantial earnings are being realized. I also appreciate the weighting of 50 per cent assigned to assets in *Sporborg v. City Specialty Stores, supra,* but I find it too to be distinguishable on its facts from the present situation.

From Kirby's standpoint, I agree that since the clarification of the definition of asset value in *Poole v. N. V. Deli Maatschappij* no reported appraisal decision has assigned more than 25 per cent weight to

asset value. *In re Olivetti Underwood Corp., supra,* (25 per cent); *Gibbons v. Schenley Industries Inc., supra,* (0 per cent); *Francis I. duPont Co. v. Universal City Studios, Inc., supra,* (12½ per cent). Yet from the facts of those cases, unlike here, the assets involved were moderate at best. Also, in *Application of Delaware Racing Association, supra,* a case wherein the assets consisted of land and a racetrack and where it was anticipated that they would continue to be used for that purpose for the indefinite future, and where there was a limited market for the stock which did not reflect its proportionate share of the assets, it was nonetheless held proper to assign a higher weight to market value than to asset value on the theory that, there being no plans to liquidate, the most likely way in the long run for an investor to have realized on his investment, had he been permitted to continue in the enterprise, would have been through the sale of his shares. Kirby would adopt this same rationale here in support of its contention that earnings value, or earnings value coupled with a constructed market value, should be given far more weight than that assigned to assets.

But while the facts in *Swanton v. State Guaranty Corporation* make it distinguishable, I feel that the logic employed by the Chancellor there is of some benefit here. At 215 A.2d 246 he stated as follows:

". . . this is not the ordinary business corporation whose value must arise in large measure from its ordinary earnings potential. Here the capital appreciation policy has succeeded. One cannot say that a stockholder is to be deprived of the benefits of that policy because of a merger. But if the stockholder is to obtain any meaningful benefit from this successful corporate policy up to this point, asset value must be weighted heavily. This is not done on the basis of a liquidation approach but because it is in this element at this time in the corporation's life that a very substantial portion of the intrinsic value of the shares is to be found."

Here Kirby is not the ordinary business corporation, even though it depends upon its manufacturing capabilities for its means of income. Moreover, its asset base had appreciated in value at the time of the merger even though it might not have come about strictly because of corporate policy. As such, it would seem, as in *Swanton,* that it constitutes a substantial benefit of which a minority stockholder should not be deprived because of a merger. Thus Kirby's asset value should be given a meaningful weight.

I feel that the 40 per cent weight assigned to asset value by the Appraiser has fairly captured the situation. As Kirby points out, asset value of $456 × 40 per cent comes to $182.40, or 71 per cent of the total value of $254.40 assigned to a share of Kirby stock by the Appraiser. While this is offered by Kirby as an indication that the Appraiser's conclusion is out of line, it can also be viewed to represent a situation wherein annual earnings are deliberately realized from only a small percentage of constantly recurring resources. I do not view this result to be as unfair as does Kirby.

The exceptions of both Kirby and the stockholders to the report of the Appraiser are denied. An appropriate order reflecting his findings and conclusions may be submitted. If any application is to be made with regard to interest, it should be accomplished promptly.