Libby G. LYNCH, Plaintiff,

v.

VICKERS ENERGY CORPORATION, Es-
mark, Inc., William A. Alexander, Rich-
ard J. Boushka, Edward J. Hudson, Don-
ald P. Kelly, Robert D. Phillips, Stormy
F. Smith and Jack A. Vickers, Defend-
ants.

Court of Chancery of Delaware,
New Castle County.

Submitted Nov. 8, 1978.

Decided April 27, 1979.

Joseph A. Rosenthal, of Morris & Rosenthal, Wilmington, Sidney B. Silverman and Joan T. Harnes, of Silverman & Harnes, and E. Allan Farnsworth, New York City, for plaintiff.

Louis J. Finger, of Richards, Layton & Finger, Wilmington, Leo Herzel, Susan Getzendanner, John Bleveans, Scott J. Davis and Michele Odorizzi, of Mayer, Brown & Platt, Chicago, Ill., for defendants Vickers Energy Corp., Esmark, Inc., Richard J. Boushka, Donald P. Kelly, Robert D. Phillips and Jack A. Vickers.

David A. Drexler, of Morris, Nichols, Arsht & Tunnell, Wilmington, and William Key Wilde, of Bracewell & Patterson, Houston, Tex., for defendants Stormy F. Smith, William A. Alexander and Edward J. Hudson.

MARVEL, Chancellor:

This class action seeks relief for the damages allegedly suffered by plaintiff, a former stockholder of TransOcean Oil, Inc. as well as by members of her class (other than those who have excluded themselves from this action) as a result of a breach of fiduciary duty found by the Supreme Court of Delaware to have been owed to plaintiff and members of her class by the defendant Vickers Energy Corporation, TransOcean's parent,[1] by the defendant Esmark, Inc., the holder of all of the issued and outstanding shares of Vickers, as well as by the directors of the defendant TransOcean who allegedly did not oppose the transaction complained of.[2]

The breach of fiduciary duty found to have been made by defendants in this case arose in connection with an offer of Vickers to purchase all of the outstanding stock of its subsidiary, TransOcean, held by such corporation's public stockholders, and the injury claimed to have been suffered is the alleged result of a scheme of defendants to acquire for Vickers as much of the publicly held stock of TransOcean as possible for the alleged inadequate price of $12 per share.

---

1. Prior to the offer for tenders of stock of TransOcean, Vickers held 53.5% of the stock of such subsidiary. On completion of such offer Vickers had become the holder of approximately 88% of the stock of TransOcean.

2. Other facts having to do with the transaction complained of are found in opinions of this Court and of the Supreme Court reported respectively in 351 A.2d 570, and 383 A.2d 278.

Since the completion of the offer for tenders, the elimination of the remaining public stockholders of TransOcean by merger has been allegedly contemplated.

Plaintiff now contends on remand that she and members of her class should be allowed to elect to take that of three allegedly available remedies which will net her and members of her class the greatest recovery, such available remedies being asserted as follows: the difference between the price of the tender offer and the fair value of TransOcean stock at the time of such offer; rescission of the tenders of TransOcean stock accepted by Vickers, or the difference between the $12 offer and the fair value of TransOcean stock at the time of the second trial in the spring and summer of 1978 plus interest.

Defendants, on the other hand, contend that the basic questions now before the Court are whether or not plaintiff and members of her class actually suffered any injury as a result of material omissions from the tender offer circular here in issue; whether or not such parties' recovery must be limited to their out of pocket damages; whether or not, in the event plaintiff and members of her class are granted rescission, they must pay defendants the tender price of $12 for each share of stock returned to them plus interest from the date of tender, and finally whether or not the intrinsic value of tendered TransOcean stock by the early summer of 1978 was in fact less than $12 per share plus interest.

The breach of fiduciary duty allegedly owed by the defendants to the public stockholders of TransOcean, according to the complaint, consisted of failing to disclose material facts concerning the tender offer in issue in a circular issued to such stockholders, as well as unfairly using a superior bargaining position attributable to control of corporate assets and processes to coerce the public stockholders of TransOcean to offer to sell their stock to Vickers for an inadequate price.

This Court, after trial, decided that plaintiff, suing for herself and members of her class, had failed to establish either actionable coercion or fraudulent misrepresentation, concluding that what plaintiff is actually seeking for the benefit of herself and of members of her class in this litigation is an appraisal of the intrinsic value of their TransOcean stock as of the time of defendants' offer for tenders in September 1974. In so deciding, this Court held that plaintiff, in seeking payment of the intrinsic value of her TransOcean stock, in fact sought a statutory appraisal, a form of relief " * * * not provided for in the Delaware Corporation Law or cognizable under general equitable principles." But see *Poole v. N. V. Deli Maatchappij, et al.,* Del.Supr., 224 A.2d 260 (1966).

On appeal, the Supreme Court reversed the order below on the ground that this Court had failed to take into consideration the fact that the defendants had failed to disclose to the public stockholders of TransOcean information in their possession germane to the transaction in issue, such information consisting of facts which a reasonable stockholder would consider important in deciding whether or not to sell his stock. The Supreme Court also ruled that this Court had erred in undertaking to evaluate the relevance and weight of evidence having to do with the value of TransOcean stock, information which had been withheld from the public stockholders of TransOcean by defendants, noting that the limited function of a trial court, in a situation such as the one at bar, was solely to determine whether or not the defendants had disclosed all information in their possession germane to the transaction in issue and that this Court had failed properly to carry out such limited function by exceeding its duty.

Having so decided, the Supreme Court found it unnecessary to decide the second basic contention made by plaintiff, namely whether or not defendants, by means of their alleged superior bargaining position and control over corporate assets and processes had improperly forced plaintiff and members of her class to sell their shares of TransOcean for an inadequate price per share, stating: "We find it necessary to discuss only the first contention made by plaintiff."

This Court, in granting judgment for the defendants, found that plaintiff had failed to prove either failure of defendants adequately to disclose facts relevant to the offer made to the public stockholders of TransOcean to purchase their stock or to have exercised improper coercion in connection with the making of such offer, concluding that what plaintiff is seeking is an unprecedented appraisal of the intrinsic value of the public stock of TransOcean formerly owned by her in a case having to do with an offer for tenders of stock. But see *Poole v. N. V. Deli Maatchappij,* supra.

Plaintiff having appealed the order of dismissal of her action to the Supreme Court, the latter, as noted above, reversed the order below, and remanded the case for a new trial, being of the opinion that the tender offer circular had failed to disclose fully two critical and material facts:[3] namely, that Forrest Harrell, a highly qualified petroleum engineer and a member of the management of TransOcean, had estimated that the net value[4] of TransOcean assets at the time of the offer in issue was worth significantly more than the estimate disclosed in the tender offer circular and that the management of Vickers had authorized open market purchases of stock of TransOcean during the period immediately preceding the September 1974 $12 per share tender offer for up to $15 per share. The reviewing Court also ruled that under the circumstances surrounding the case that the limited function of this Court in a situation in which the majority owed the duty of dealing with the minority with entire fairness, *Sterling v. Mayflower Hotel Corp.,* Del.Supr., 93 A.2d 107 (1952), *Singer v. Magnavox,* Del.Supr., 380 A.2d 969 (1977), and *Tanzer v . International General Industries, Inc.,* Del.Supr., 379 A.2d 1121 (1977), was to:

" * * * examine what information defendants had and to measure it against what they gave to the minority stockholders, in a context in which 'complete candor' is required."

The Supreme Court concluded:

"The Court emphasizes that we do not hold that the Harrell estimate was a more accurate estimate of TransOcean's net asset value, nor do we determine that $15 was a more reasonable price for the TransOcean stock. We only hold that the minority shareholders had the right to this information and to make their respective judgments about its significance before they were asked to sell their shares to Vickers."

Turning to the question of the value of the tendered stock of the public stockholders of TransOcean, it is pointed out by defendants and not denied by plaintiff that for a period of eighteen months following formal disclosure of the Harrell report at trial in the late spring of 1975, as well as the disclosure that the purchase by Vickers of shares of TransOcean stock on the open market for up to $15 per share had been authorized by defendants, the price of TransOcean stock remained at or below $12 per share. Accordingly, it is argued, plaintiff and members of her class could and should have covered their sales of Trans-Ocean stock by replacing such stock through market purchases, *Mitchell v. Texas Gulf Sulphur* (C.A.10) 446 F.2d 90, cert. denied 404 U.S. 1004, 92 S.Ct. 564, 30 L.Ed.2d 558 (1971), and see D. Dobbs, Remedies, Section 9.3 at p. 616.

Plaintiff answers this contention by pointing out that in light of Esmark's announced intention to acquire through Vickers all of the stock of TransOcean, by merger if necessary, that the expected merger price per share would probably be in the vicinity of $12 and in reply to defendants' contention that on learning at the 1975 trial, if not before, of the Harrell report and armed with such disclosure, plaintiff and members of her class could have, by

---

3. The Court noted "And by 'germane' we mean, for present purposes, information such as a reasonable shareholder would consider important in deciding whether to sell or retain stock."

4. $250,800,000.

making purchases in the over-the-counter market, made timely replacement of their tendered TransOcean stock, *Mitchell v. Texas Gulf Sulphur Co.*, supra, and *Gerstle v. Gamble-Skogmo, Inc.* (C.A.2), 478 F.2d 1281 (1975), plaintiff points out that 4,500,000 shares of TransOcean were tendered in response to the offer of Vickers to buy, leaving approximately 1,500,000 such shares outstanding. Of such remaining shares, those of Morgan Guaranty Company, totaling 500,000, were allegedly not for sale, nor were the 140,000 shares belonging to the individual defendant Edward J. Hudson allegedly available. Plaintiff also surmises that there were other large stockholders of TransOcean who were unwilling to tender their shares in return for the offer of $12 and who would presumably be unwilling to sell their stock to plaintiff and members of her class at or below the offering price. Thus, plaintiff argues, there being a limited market to resort to for the purpose of replacing shares of TransOcean, it constituted no real market for the free exchange of such shares. Furthermore, the price of $12 or less bid for the few shares of TransOcean traded in the over-the-counter market, in any event, did not reflect the intrinsic value of such stock because of the expressed intention of Esmark ultimately to eliminate the minority shares of TransOcean. However, no genuine effort to replace tendered shares appears to have been made and the passive acceptance that $12 was the top limit to be expected from defendants for TransOcean stock does not reflect confidence in plaintiff's theory of her case.

Passing over the above contentions for the present and turning to the basic issue to be decided after a second trial, namely the appropriate remedy to be accorded plaintiff for the injury allegedly suffered by her and others as a result of defendants' breach of their fiduciary duty owed plaintiff and other public stockholders of her class, it appears that in the cited case of *Poole v. N. V. Deli Maatchappij*, supra, that the defendant corporation prior to offering by circular letter to purchase the publicly held shares of American Sumatra Tobacco Corporation was already the holder of over 50% of such shares. As a result of such offer and the response thereto defendant became the holder of over 90% of such shares. Later, American Sumatra Tobacco Company was merged into a wholly owned subsidiary of defendant, and the sum of $17 per share was offered to the non-consenting former stockholders of American Sumatra, the same price per share which had been offered to plaintiffs for their shares and accepted.

Plaintiffs then brought a class action on behalf of themselves and all other former holders of the stock of American Sumatra who had sold their stock to defendant in alleged reliance on the latter's offering letter, the Court noting:

"The gravamen of the action is that the Offering Letter contained false, misleading and fraudulent representations, and that the stockholders who sold to Deli pursuant thereto were induced to sell their shares at a grossly inadequate price in reliance thereon. By this action, the plaintiffs seek to recover the difference between $17 per share paid by Deli and the true value of their stock."

On appeal, plaintiffs contended that the trial court had erred in the method employed by it to reach a determination of the actual value of the stock in issue on a going concern basis, arguing that because it was clear on the record that defendant had plans to liquidate its substantial holdings of real estate because of the possibility that the use of tobacco leaf for cigar wrappings might be displaced by manufactured wrappers that the value of their shares should be fixed on the basis of net corporate assets rather than on market value and earnings value as well. After noting that:

"The general rule is that in determining the actual value of stock, consideration should be given to the various relevant factors of value including earnings, dividends, market price, assets, and any other pertinent factors on a 'going concern' basis",

the Supreme Court of Delaware concluded that such rule applied in the present case,

being satisfied that a corporate liquidation was not imminent and that because the alleged false, misleading and fraudulent misrepresentations made in defendant's offering circular had allegedly induced plaintiffs and members of their class to sell their shares of American Sumatra to defendant for a grossly inadequate price, they were entitled to be paid the fair value of their shares. Because the same fiduciary duty of a majority stockholder to the minority existed in the cited case as exists here in a situation involving a failure to disclose germane information to minority stockholders rather than a more serious breach of fiduciary duty consisting of publication and distribution to minority stockholders of misleading and fraudulent misrepresentations, the rule of the cited case should, I believe, apply a fortiori to the case at bar.

Plaintiff argues, however, that although the case of *Poole v. N. V. Deli Maatchappij,* supra, was not cited in this case on appeal or in either *Singer v. Magnavox, supra,* or *Tanzer v. International General Industries, Inc.,* supra, that in a merger in which public stockholders are to be eliminated by cash payments for what would otherwise be a valid business purpose, the granting of a statutory appraisal is not the equivalent of a fairness hearing because even where a merger has been effected for legitimate business reasons there may still be a violation of a fiduciary duty owed by majority stockholders to the minority because in the words of the Supreme Court in *Tanzer v. International General Industries, Inc.,* supra.

"This ruling, however, does not terminate the litigation because, given the fiduciary duty owed in any event by IGI to the minority stockholders of Kliklok, the latter are entitled to a fairness hearing under *Singer.* The Chancellor's opinion, announced at the preliminary injunction stage of this proceeding, discussed fairness only in terms of the price offered for the stock, but that was too restrictive. The test required by Singer, which applied the rule of *Sterling,* involves judicial scrutiny for 'entire fairness' as to all aspects of the transaction."

On a second appeal the trial court's finding of an appraised value of $15.92 for the shares in issue as opposed to defendant's offering price of $17 was affirmed, *Poole v. N. V. Deli Maatchappij,* Del.Supr., 243 A.2d 67 (1968).

During the months of May, June and July, 1978, some ten trial days or their equivalent were devoted to the retrial of this case on remand, and I am satisfied that at such second trial full opportunity was afforded to address the issue of fairness and to seek to introduce all appropriate evidence on such issue. At such trial, each side chose to concentrate almost exclusively on the issue of the value of plaintiff's tendered shares as opposed to a possible right of plaintiff or of members of her class to be restored to the status of public stockholders of TransOcean, plaintiff contending that her shares had a value based exclusively on the value of net assets and that the Forrest Harrell report basically controlled.

And while plaintiff vigorously argues that the oil industry is a wasting asset industry of a unique nature, which is utterly unlike a manufacturing business because it must depend for its success on the sale of its assets, namely petroleum and natural gas and the like, and that accordingly the value of its stock must be calculated solely on the basis of the value of its net assets, I fail to find any basic distinction between the nature of TransOcean's assets and those of a timber company, *Bell v. Kirby Lumber Corporation,* Del.Ch., 395 A.2d 730 (1978). In each business assets must be replaced, in the case of a timber company by reforestation and purchases and in the case of a petroleum business by purchases and drilling. In the cited case, this Court declined to give more than a 40% weight to asset value in ruling on exceptions to an appraiser's report. Furthermore, in stressing the abnormally low market price for TransOcean stock in the fall of 1974 as a reason to suspect the market, plaintiff overlooks the fact that all industrial shares were depressed at that time in the worst bear market since the great depression which preceded World War II.

■ Turning to the nature of the relief to which plaintiff and members of her class are entitled, it must, first of all, be noted that in the case of an offer to buy all of the publicly held stock of a corporation, even where such corporation is already the subsidiary of the would-be purchaser, it is the prerogative of the stockholder, whose stock is sought to be purchased, to decline to sell, and such person's status as a stockholder is thus not subject to being forcibly transmuted into something different as is the case in the event of a merger. Therefore, it would appear to follow that the degree of fiduciary duty owed by a majority stockholder to the minority is not as compelling as in a situation such as is found in the case of a merger in which the interests of a minority stockholder are transmuted into something different without such stockholder's consent. Significantly, there is still a market in which to buy and sell TransOcean stock despite defendants' warning to the contrary in September, 1974.

■ Next, although the Delaware Corporation Law makes no statutory provision for guidelines in a proceeding to fix the intrinsic value of stock of a Delaware corporation or for the calculation of damages arising as a consequence of an alleged unfair offer of a parent corporation to buy the stock of its subsidiary's minority stockholders for an inadequate consideration or in any other non-merger situation in which a stockholder's equity has been or is threatened to be eliminated through a sale of assets, by charter amendment or by dissolution, the statutory right to an appraisal being reserved for dissidents who have properly preserved their rights to such solely in the case of a merger, I conclude that a proceeding analogous to an appraisal hearing such as is provided for in merger cases is appropriate here, *Poole v. N. V. Deli Maatchappij,* supra, in a situation in which active fraud has not been alleged or proved.

■ First of all, as noted earlier in this opinion, I decline to fix a value on a share of TransOcean stock as of the time of the September, 1974 offer of Vickers arrived at solely on the basis of asset value, there having been no firm proposal for the sale of all or substantially all of the corporate assets of TransOcean or their proposed liquidation or the threat of such. On the other hand, while the value of corporate net assets is an important element to be considered in fixing the intrinsic value of shares of stock, particularly of a wasting asset corporation such as an oil drilling company, there was demonstrated at trial a great disparity between the several estimates of net assets of TransOcean adduced by a number of expert witnesses for both the plaintiff and defendants. Accordingly, because each of the witnesses who testified was qualified either as a petroleum geologist or as a securities analyst or the like in an area in which exploration for the product to be marketed, namely oil and natural gas, frequently ends in disappointment as well as in unexpected success, the estimates of qualified experts representing respectively the interests of plaintiff and members of her class as well as those of defendants must be viewed in light of such opposing interests. In reaching a conclusion on the per share value of stock of TransOcean as of September, 1974 on a net asset basis, I have considered principally the estimates of the witnesses Karlbloom, Harrell, Malson, Walter and Chalsty, and have arrived at a value of such net assets as of said date of $17.50 per share, which value will be set at 40%, leading to a net asset value per share of TransOcean, by applying the traditional formula followed in this Court for many years in merger cases, of $7.00 as of September, 1974. Compare *Bell v. Kirby Lumber Corporation,* supra.

As far as market value is concerned and despite the fact that shares of TransOcean were traded for as low as $6.75 per share to $8.00 per share during the summer of 1974, and that on September 23, 1974, two days before the offer here in dispute was made TransOcean stock was traded for just under ten dollars a share, I have decided to accept Mr. Karlbloom's market value of $9.48 and give it a weight of 40% or a weighted value of $3.80 per share, *Application of Delaware Racing Association,* Del.Supr., 213 A.2d 203

(1965). See also *Mills v. Electric Auto-Lite Co.* (C.A.7) 552 F.2d 1239, cert. denied, 434 U.S. 922, 98 S.Ct. 398, 54 L.Ed.2d 279 (1977), in which the Court of Appeals stated:

"We hold that when market value is available and reliable, other factors should not be utilized in determining whether the terms of a merger were fair. Although criteria such as earnings and book value are an indication of actual worth, they are only secondary indicia. In a market economy, market value will always be the primary gauge of an enterprise's worth."

Finally, as to earnings value I accept Mr. Karlbloom's average of TransOcean's earnings for the traditional period of five years preceding the offer for tenders of $.35 per share as well as a multiplier of approximately 17.4, which results in an earnings value per share of TransOcean stock of from $4.80 to $6.09 as of September, 1974. I decline to consider speculative future earnings, and as TransOcean has never declared a dividend, such factor will not be considered. The above findings as to value will be adjusted and summarized as follows:

| Asset value | $17.50 x 40% | $ 7.00 |
| Market value | $ 9.48 x 40% | $ 3.80 |
| Earnings value | $ 5.25 x 20% | $ 1.05 |
| Total | | $11.85 |

These findings lead to the conclusion that plaintiff and members of her class were not injured by defendants' failure to disclose the material facts here in issue, *Mills v. Electric Auto-Lite Co.*, supra.

Next, assuming but not deciding that plaintiff and members of her class would be additionally entitled to rescission of their 1974 sales of TransOcean stock on the ground that defendants' failure to disclose material facts concerning the value of TransOcean stock in the 1974 offering circular constituted a formal breach of trust, although such non-disclosures do not constitute misappropriation of profits or the like realized as a result of the taking or using of another's property, *Ervin v. Oregon Railroad and Navigation Co.* (SDNY) 27 F. 625 (1886), I am satisfied that plaintiff has not established a claim to such form of relief.

In fact, it is clear in the case at bar that none of the defendants has gained any profit as a result of purchase of the tendered stock on which no dividend has ever been paid, and that because defendants have been found to have dealt fairly with plaintiff and members of her class, the latter have no claim for damages. Compare *Janigan v. Taylor* (C.A.1) 344 F.2d 781, cert. denied 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965), and see *Mills v. Electric Auto-Lite Co.*, supra.

I am satisfied that, in any event, were it clear that plaintiff and members of her class are entitled to more than out-of-pocket damages, namely rescission, defendants in such event would be entitled to a return of the offering price for their stock of $12 plus interest at a rate equivalent to what a prudent investor would have earned on such moneys over the same period, namely 13.1%, so that from October 1974 to October 1978 the $12 received by each stockholder of TransOcean who tendered his stock would have reasonably been expected to increase to $19.64, the approximate market price of TransOcean stock as of recently on the over-the-counter market. In short, I am satisfied that plaintiff and those of her class cannot be permitted to claim damages as a result of failure to mitigate such damages.

Turning to the question of the value of TransOcean stock as of the time of the 1978 trial, I am persuaded that the most reliable estimate adduced at trial of the value of a share of TransOcean stock as of such time was approximately $15.00 per share, a figure which I find to be supported by the most persuasive testimony and other evidence of record, and less than any minority stockholder who tendered his stock in 1974 could have expected to gain by the process of prudent investment of his $12 tender price per share added to such price, the figure of $40 per share claimed by plaintiff as of mid-1978, again on a net asset basis, being utterly unrealistic in light of the market price of Esmark. In short, if a share of TransOcean actually had had a value of $40 in mid-1978, as plaintiff contends, then the

common stock of Esmark, the holder of all of the stock of Vickers, would be worth substantially more per share than was quoted on the New York Stock Exchange in mid-1978. My conclusion is that the most persuasive analysis of TransOcean's economic situation as of mid-1978 is well summarized by Mr. Karlbloom in a situation in which, except for the special circumstances surrounding South Marsh Island, plaintiff's properties have not been as productive as those of comparables. Therefore, according a 50% weight to net assets, or $14.31 per share, 30% to market, or $15.06 per share, and 20% to earnings, or $13.14 per share, the result as of mid-1978 is $14.31 per share, or less than the $12 tender price plus returns from its prudent investment. In so concluding, I have also given consideration to Mr. Gruy's testimony because the person who prepared such report did so under his direction and the witness was thus responsible for its contents, as well as that of Mr. Harrell and Mr. Malson, who testified as persons with an interest in TransOcean rather than as experts and were thus qualified to testify as to the value of such corporation's stock, although their testimony must be read in light of their allegiance to defendants, *Fidanque v. American Maracaibo Co.*, Del.Ch., 92 A.2d 311 (1952), and see "Admissibility of Opinion of Non Expert Owner as to Value of Chattel," 37 A.L.R. 1967.

▪ Furthermore, because the fairness hearing held in this case was not a statutory appraisal trial, I decline to strike the testimony of Mr. Harrell and of Mr. Malson on the ground that such constituted hindsight opinion as to value, being satisfied that such testimony throws important light on the intrinsic value of the stock here in issue as of the times here relevant and is not to be barred on the basis of the statutory and case law having to do with mergers.

Finally, I consider it significant that neither plaintiff nor members of her class seized the opportunity furnished by the second trial to clarify their position as to the effect on their decision to sell their shares of TransOcean stock of the omissions which should have been included in defendants' circular letter. It therefore follows that no liability to such persons has been demonstrated to have been incurred by either the corporate or individual defendants on the basis of a claim for the recovery of out-of-pocket damages, the only possible ground which plaintiff and those of her class could expect to serve as a foundation for their claims under the findings herein made.

I conclude for the reasons above outlined that plaintiff and members of her class were not damaged as a result of the omissions in the September 1974 circular letter here in issue.

On notice an order may be presented dismissing plaintiff's complaint and entering judgment for the defendants.