**The HERNANDO BANK and Gateway Capital Corporation, Plaintiffs,**

v.

**Sharon Smith HUFF, William B. Kountz, Jr., Robert A. Kountz, Diane Smith McDowell, and Mrs. Willie W. Kountz, Defendants.**

No. DC83–49–NB–O.

United States District Court,
N.D. Mississippi,
Delta Division.

May 13, 1985.

---

John W. Dulaney, Tunica, Miss., for defendants.

## MEMORANDUM OPINION

BIGGERS, District Judge.

This diversity case involves valuation of the stock of several shareholders who dissented to the change of corporate form by plaintiff Hernando Bank, a banking corporation, to a banking corporation owned by a one-bank holding company, plaintiff Gateway Capitol Corporation. In a vote taken on September 9, 1982, a sufficient number of shareholders in the Hernando Bank approved the change in corporate form; thus, the Hernando Bank subsequently became a wholly-owned subsidiary of Gateway Capital Corporation. The defendants herein dissented to the proposed merger and perfected their rights pursuant to Miss.Code Ann. § 79–3–161 (1972) to demand that their stock be purchased by the plaintiff Hernando Bank.[1]

### A. Statutory Construction

In accordance with the Mississippi statute, the Hernando Bank obtained an appraisal of the stock from Morgan-Keegan of Memphis, Tennessee. Morgan-Keegan determined that the stock had a **fair market value** of $78.50 per share, to which the Hernando Bank added accrued dividends and offered the defendants the sum of $80.50 per share.[2] This offer was rejected by the defendants; thus, the plaintiffs seek a court determination of the proper value per share of stock.

Charles M. Merkel, Clarksdale, Miss., William W. Ballard, Hernando, Miss., for plaintiffs.

1. The Mississippi Corporate Dissent Statute, Miss.Code Ann. § 79–3–161 (1972), provides in part that upon a proposed change in corporate form,

> any ... shareholder may ... make written demand on the corporation ... for payment of the fair value of such shareholder's shares and, if such proposed corporation action is effected, such corporation shall pay to such shareholder, upon surrender of the certificate or certificates representing such shares, the fair value thereof as of the day prior to the date on which the vote was taken approving the proposed corporate action, excluding any appreciation or depreciation in anticipation of such corporate action.

2. The Mississippi Corporate Dissent Statute, like that of many jurisdictions, provides that "fair value" shall be paid for the stock. Although "fair value" is not statutorily defined, it is generally accepted that the term is not necessarily synonymous with "fair market value," and instead contemplates an equitable evaluation wherein other relevant factors are considered. *See, e.g., In Re Watt & Shand,* 452 Pa. 287, 304 A.2d 694 (1973) (fair value is intrinsic value, not necessarily fair market value). The Morgan-Keegan appraiser testified that he never considered any distinction between "fair value" and "fair market value."

*Cal-Maine Foods, Inc. v. Duvic,* 264 So.2d 383 (Miss.1972) is the only reported decision involving the statute in issue. In that case, the Mississippi Supreme Court found no reversible error in the valuation placed on dissenters' stock by a chancellor, stating that such determination under Mississippi law is a purely factual issue to be resolved by the trier of fact. *Id.* at 384. Inasmuch as the absence of case law requires this court to make an *"Erie* guess" regarding construction of the statute, *see Bernhardt v. Polygraphic Co. of America,* 350 U.S. 198, 204–05, 76 S.Ct. 273, 277, 100 L.Ed. 199, 206 (1956), the factors viewed by the chancellor provide this court with some guidance. These factors include

> the liquidating value, the net asset value, the market value, the asset value, the dividends, the earnings prospects, the nature of the enterprise, the general market conditions, the availability of financing, management's performance, prospects for dividends, past and future earnings, general economic conditions under which the company was operated, particular industry involved, the trends within that industry, the long range obligations of the company, and the long range prospects of the company, and including the offers of the defendant to the complainant ... and the investing experience of the complainant and of the defendant....

*Duvic v. Cal-Maine Foods, Inc.,* No. 81,-116, slip op. at 9 (Miss.Ch., 1st Jud.Dist. Hinds Cty. July 20, 1971).

■ The defendants argue that the statute excludes consideration of any purchase offers, since fair value must be determined on the date prior to approval of the proposed corporate action and without reference to appreciation or depreciation in anticipation of such action. This provision indicates to the court that the corporation should be viewed as a going concern, rather than a liquidated entity.[3] However, the statutory prohibition against the consideration of any appreciation or depreciation in anticipation of a corporate merger in no way excludes consideration of purchase offers made for this or comparable corporations. In fact, since the going concern value of a company is generally defined as "its worth as an operating business to another firm or individual," *see* Western & Brigham, Essentials of Managerial Finance 443 (6th ed. 1982), such offers have particular relevance. In the case of an offer for a comparable company, the relevance of a purchase offer is not diminished due to the consummation of the sale.

### B. Minority Discount

Furthermore, the defendants argue at length that their stock shares should be valued as a pro rata share of the corporation, and that a "minority discount" due to the lack of corporate control in such shares is improper. The defendants strenuously contend that a minority shareholder should not be "punished" for his lack of a controlling interest by discounting his stock, especially since the corporate change in form is involuntary with respect to the dissenter. *See Dreiseszun v. FLM Industries, Inc.,* 577 S.W.2d 902, 906 (Mo.App.1979) (minority discount improper); *Woodward v. Quigley,* 257 Iowa 1077, 133 N.W.2d 38, 41, *modified on rehearing,* 257 Iowa 1077, 136 N.W.2d 280 (1965) (same).

■ Despite the superficial appeal of the defendants' argument, the court is unconvinced that a minority share of stock should be valued as though it were a controlling share of a corporation. Accordingly, the court concludes that in the present case a minority discount is proper in determining the fair value of the stock of the dissenters.

### C. Valuation

■ Courts universally view three elements in determining the fair value of

---

**3.** Case law uniformly holds that a dissenting shareholder is entitled to receive his intrinsic share of a going concern. *See e.g., Welsh v. Indep. Bank & Trust Co.,* 1 Conn.App. 14, 467 A.2d 941, 942 (1983); *In Re Watt & Shand,* 304 A.2d at 697–98; *Southdown, Inc. v. McGinnis,* 89 Nev. 184, 510 P.2d 636, 640 (1973); *Application of Delaware Racing Ass'n,* 42 Del.Ch. 406, 213 A.2d 203, 209 (1965); *Tri-Continental Corp. v. Battye,* 31 Del.Ch. 523, 74 A.2d 71, 76 (1950).

stock—market value, asset value, and investment (or earnings) value. *Valuation of Dissenters' Stock Under Appraisal Statutes,* 79 Harv.L.Rev. 1453, 1457 (1966). However,

> all three elements do not have to influence the result in every valuation proceeding. It suffices if they are all considered. Compelling the consideration of all of them, including those which may turn out to be unreliable in a particular case, has the salutary effect of assuring more complete justification by the appraiser of the conclusion he reaches. It also provides a more concrete basis for court review.

*Endicott Johnson Corp. v. Bade,* 37 N.Y.2d 585, 376 N.Y.S.2d 103, 106, 338 N.E.2d 614, 616 (N.Y.1975). This court approves of the approach adopted in *Endicott* and other cases, and therefore shall consider all three methods.

### 1. Market Value Approach

 Market value, or fair market value, is "the amount that a purchaser who is willing, but not required to buy, would pay, and that a seller who is willing but not required to sell, would accept"; *Bear Creek Water Association v. Town of Madison,* 416 So.2d 399, 402 (Miss.1982); furthermore, it is necessary that "both the purchaser and the seller be fully informed of all the circumstances involving the value and use of the property." *Id.* at 403. In determining fair market value of stock, the price at which recent sales were made obviously is relevant. Although the market for stock in the Hernando Bank was relatively thin and primarily consisted of insider transactions in non-controlling stock interests, the value at which the stock changed hands is nonetheless significant.

 Evidence presented at trial showed that the Hernando Bank issued new shares of stock in 1974 and 1977 at $80.00 and $85.00 per share, respectively. Despite some evidence to the contrary, the court finds that the Hernando Bank experienced healthy growth between such dates and the time of the merger. In making this determination, the court is persuaded by many items of evidence presented at trial. For example, between 1974 when the officers and directors valued new Hernando Bank stock at $80.00 per share, and 1982 when the bank merged, deposits had a 155% increase from $19,100,000.00 to $48,700,-000.00. Furthermore, between 1977 and September 8, 1982, bank assets increased by 70%, from $31,300,000.00 to $53,200,-000.00. In 1977, earnings before securities transactions were 246,000.00; however, 1981 brought a 96% increase to $482,-000.00. Furthermore, loans increased by 70% from $28,700,000.00 in 1977 to $48,-700,000.00 in 1982; however, the loan loss ratio was one of the lowest in the state. Bank capital increased from $2,300,000.00 in 1977 to $3,400,000.00 in 1982, and investments practically doubled from $10,300,-000.00 to $19,000,000.00 during the same period. The substantial growth is due to both population increase in DeSoto County and the good management of the Hernando Bank.

In view of the substantial growth of the Hernando Bank, this court has difficulty in understanding how the market value of the stock could have decreased to $78.50 per share, as determined by the Morgan-Keegan appraisal. It is even more difficult for this court to accept the plaintiffs' current contention that Morgan-Keegan erroneously adjusted the value of the stock upward to compensate for a market depression, and that the proper valuation is only $45.00 per share. The court instead is impressed by the fact that there were a number of sales in the $95.00 to $100.00 range in recent years prior to the evaluation date.[4] Furthermore, the court notes that the officers and directors of the Hernando Bank set $95.00 as the price at which the bank's Employee Stock Option Plan (ESOP) would purchase stock shares. In view of this

**4.** The defendants have asserted that $95.00 per share is not the proper fair market value in this case, since such price reflects a minority discount. Inasmuch as the court accepts that a minority discount is proper, the $95.00 sales are relevant in determining fair market value.

evidence, the court determines that $95.00 per share is the proper market value.

### 2. Asset Value Approach

The asset value approach, which involves valuation of the total corporate assets, is most useful in cases wherein the corporation is to be liquidated and the assets sold, since "minority stockholders typically have invested for dividend income or stock appreciation and rarely expect to share in the physical assets." 79 Harv.L.Rev. at 1460. *See also In Re Valuation of Common Stock of Libby, McNeill & Libby,* 406 A.2d 54, 66 (Me.1979) (net asset value generally not heavily weighted in stock valuation unless such valuation made for liquidation purposes).

■ In the present case, the sole evidence submitted regarding the value of the corporate assets was a fire insurance policy on some of the bank's assets. Inasmuch as this policy at best is probative only as to the value of the physical corporate assets rather than the corporate realty, and since the present case does not involve a corporate liquidation, the court gives the asset value approach little weight in the present case.

### 3. Investment Value Approach

The third method used in stock valuation is the investment value approach, wherein the earnings of the company are multiplied by the company's price-earning ratio. In computing the earnings to be used, courts generally require an average of the earnings for the previous five years, *see, e.g., Universal City Studios, Inc. v. Francis I. duPont & Co.,* 334 A.2d 216, 218 (Del. 1975); *Application of Delaware Racing Association,* 213 A.2d at 212, excluding extraordinary gains and losses during that period; *see, e.g., Gibbons v. Schenley Industries, Inc.,* 339 A.2d 460, 470 (Del.Ch. 1975); *Felder v. Anderson, Clayton & Co.,* 159 A.2d 278, 284 (Del.Ch.1960). The average annual yearly earnings for the Hernando Bank from 1977 through 1982, using projected earnings for 1982 due to the

merger on September 9, 1982, were $340,000.00.

The plaintiffs, relying in part on the Morgan-Keegan appraisal, suggest a multiplier of 5.61, based upon trades of common stock of purportedly comparable publicly traded bank holding companies in the southeast region of the United States. However, the defendants assert that the Hernando Bank, a non-publicly traded corporation, is not comparable to a publicly traded bank holding company, *see* 79 Harv.L.Rev. at 1463 (comparison of publicly traded and non-publicly traded corporations unreliable), and further assert that Morgan-Keegan selected these companies as comparables simply because data on such companies was available in their Memphis office. In addition, the defendants contend that the bank holding companies used as comparable by Morgan-Keegan differ greatly from the Hernando Bank in amount of deposits, assets, quality of securities portfolios, non-bank income or loss, loan losses, and issuance of preferred stock.

Instead, the defendants have conducted an exhaustive national search of over 800 complete bank sales and found ten sales that purportedly met the test of comparability with Hernando Bank. *See* Desmond & Kelly, Business Valuation Handbook 257 (4th ed. 1980) (no requirement that comparable business be located within immediate community). Using a multiplier of twelve, as suggested by the defendants based upon their study, the investment value approach computed on the average earnings for the previous five years yields a result of $102.00 per share for the 40,000 outstanding shares.[5] This result is very close to the fair market value of $95.00 to $100.00 per share established through actual sales.

### 4. Fair Value of the Stock

■ The court concludes that the fair value of the stock is $100.00 per share. This result appears to be the fair market value of the stock, and is confirmed through the investment value approach.

---

5. ($340,000 × 12)/40,000 = $102.00 per share.

### D. Costs and Expenses

■ Miss.Code Ann. § 79–3–161 mandates that costs and expenses of the proceeding shall be assessed against the corporation, unless the court determines that the action of the shareholders in refusing to accept the offer was arbitrary, vexatious, or not in good faith. In view of the court's disposition of the case, it cannot be said that the shareholders' actions were improper; thus, the corporation has statutory liability. However, the statute provides that recoverable expenses shall exclude fees and expenses of counsel and experts, although fees and expenses of experts may be allowed if the court determines that the fair value of the shares as determined materially exceeds that amount offered by the corporation. In the present case, the court holds that the fair value of the stock as determined materially exceeds that amount offered. Thus, the court awards to the defendants herein the sum of $5,000.00 as reasonable expenses and fees of their expert witnesses. However, the defendants' request for attorney fees shall be denied.

### E. Interest

Miss.Code Ann. § 79–3–161 further mandates that interest shall be awarded on the judgment from the date on which the vote was taken on the proposed corporate action to the date of payment, at such rate as the court shall deem fair and equitable. Based upon the rate of return in effect for a one-year certificate of deposit on September 9, 1982, the court determines that a fair rate of interest on this judgment shall be 10.5%, compounded annually. Such interest on the total $129,200.00 judgment shall run from September 9, 1982 until the judgment is satisfied.

Let an order issue accordingly.