**In re VALUATION OF COMMON STOCK OF McLOON OIL CO., et al.**

Supreme Judicial Court of Maine.

Argued Sept. 20, 1989.

Decided Nov. 3, 1989.

Peter M. Garcia (orally), Jane Z. Schau, Skelton, Taintor & Abbott, Auburn, Joel Seligman, University of Michigan School of Law, Ann Arbor, Mich., for Lido Co. of N.E.

Howard H. Dana, Jr. (orally), Verrill & Dana, Portland, for dissenting shareholders.

Before McKUSICK, C.J., and ROBERTS, WATHEN, GLASSMAN and HORNBY, JJ.

McKUSICK, Chief Justice.

Ten years ago we examined for the first time the principles to be applied in finding the "fair value" of a dissenting shareholder's stock under the recently enacted Maine Business Corporations Act.[1] *See In re Valuation of Common Stock of Libby, McNeill & Libby*, 406 A.2d 54 (Me.1979). *Libby* involved a public corporation with common stock listed on the New York Stock Exchange. In the present appeal we revisit the fair value question in an appraisal proceeding involving three Maine corporations with untraded stock owned entirely by the members of a single family.

On December 6, 1976, McLoon Oil Co., Morse Bros. Oil Co., and T–M Oil Co., along with several Massachusetts companies, merged into the Lido Company of New England, Inc. (hereinafter "Lido"), a New Hampshire corporation. Two dissenting shareholders of the Maine companies sued for appraisal rights under 13–A M.R.S.A. § 909 (1981). Adopting the report of the court-appointed referee, the Superior Court (Androscoggin County, *Alexander, J.*) determined that the aggregate fair value of each dissenting shareholder's common stock in the three companies as of December 5, 1976, was $334,925 and awarded 8% simple interest thereon until the date of payment.

On its appeal Lido's principal contention is that the court erred in refusing to apply minority and nonmarketability discounts in determining the fair value of the dissenting shareholders' stock. Lido also contends that the dissenting shareholders failed to

---

[1]. Prior to the enactment of the Maine Business Corporations Act to be effective January 1, 1972, P.L.1971, ch. 439, Maine had had since 1891 an appraisal rights statute entitling a dissenting shareholder to recover the "value" of his stock. *See* P.L.1891, ch. 84, § 4, which in successive codifications without material change became 13 M.R.S.A. § 283 (1964). The only reported cases under the prior statute were terminated for procedural reasons before final adjudication of the stock valuation issue. *See Johnson v. C. Brigham Co.*, 126 Me. 108, 136 A. 456 (1927); *Fenderson v. Franklin Light & Power Co.*, 120 Me. 231, 113 A. 177 (1921).

comply with the procedural requirements of the appraisal statute and brought the suit in the wrong county so far as the McLoon Oil Co. shares are concerned. Lido finally asserts error at trial in the admission of the testimony of one of the dissenting shareholders' expert witnesses and in the referee's balancing of equities in setting the 8% interest rate on the award. We reject those contentions.

The dissenting shareholders cross-appeal, challenging the court's denial of attorney fees and its determination of interest. We find no error in the denial of attorney fees, but we do modify the judgment to award compound rather than simple interest.

### Facts and Procedural History

McLoon, Morse Bros., and T–M Oil Companies were closely held companies entirely owned by the members of the Pescosolido family under the leadership of Carl Pescosolido, Sr. Two of his sons, Carl Jr. and Richard, each held 475 shares in McLoon, 800 shares in Morse Bros., and 350 shares in T–M. The combined holdings of Carl Jr. and Richard constituted 50% of the McLoon common stock, 50% of the Morse Bros. common stock, and 14.3% of the T–M common stock.[2]

In December 1975 Carl Sr. proposed to merge all family-held companies into Lido, over which he would exercise sole voting control.[3] Carl Jr. and Richard (hereinafter "Dissenters") objected in writing to the proposed merger. On December 6, 1976, the parties executed a merger agreement in which the Dissenters expressly preserved their appraisal rights under 13–A M.R.S.A. § 909. On December 15, 1976, the Dissenters individually wrote to each of the three Maine companies and requested payment for their shares. On January 8, 1977, Lido responded by offering each Dis-

senter $128,685.55 for his combined interests in all three companies. Within a week, both Dissenters formally rejected that offer.

Pursuant to 13–A M.R.S.A. § 909(9)(B), the Dissenters on April 1, 1977, filed a Superior Court suit nominally in Lido's name for valuation of their stock in all three companies.[4] They brought that consolidated appraisal proceeding in Androscoggin County.

Ten years later, on May 22, 1987, acting pursuant to M.R.Civ.P. 53 and with the agreement of the parties, the Superior Court (*Delahanty, J.*) appointed Professor David P. Cluchey of the University of Maine School of Law to serve as referee to determine all issues in the case. The referee held eight days of hearings in December 1987 and issued a draft report on August 15, 1988. Both parties offered comments in early September. On October 28, 1988, the referee filed his report. On Lido's motion the referee later filed a clarifying amendment on November 15. When the entire record was filed with the court on December 15, 1988, Lido objected to the report and the Dissenters moved for its acceptance with modifications. The Superior Court (*Alexander, J.*) accepted the referee's report in full and on March 3, 1989, ordered judgment entered in accordance therewith. Thus the court ordered Lido to pay each Dissenter in exchange for his stock the sum of $334,925 (i.e., 2.6 times as much as had been offered by Lido) with 8% simple interest from December 6, 1976, to the date of payment and awarded the Dissenters expert witness compensation and costs in the amount of $42,781.45.

### Standard of Review

 The appraisal rights statute allows the Superior Court to appoint an appraiser

---

**2.** With the agreement of all parties prior to the merger, Richard transferred one share of Morse Bros. stock and one share of McLoon stock to his attorney, who voted those shares in favor of the merger so as not to block the transaction. The referee determined that in the circumstances the transfer did not violate the requirement of 13–A M.R.S.A. § 909(3) that dissenting shareholders cannot vote in favor of the proposed corporate action.

**3.** A third brother, William B. Pescosolido, retained an interest in Lido.

**4.** Lido countered with a separate suit against the Dissenters, alleging misapplication of funds and debts owed the corporation. Lido's suit against the Dissenters was dismissed for want of prosecution in December 1985.

"to receive evidence and recommend a decision on the question of fair value." *See* 13-A M.R.S.A. § 909(9)(E). In the case at bar, however, the court appointed a referee for the full trial of the action pursuant to M.R.Civ.P. 53 because the referee's broader powers were necessary for the determination of factual and legal issues beyond that of fair value. With the parties' agreement, the referee by the order of reference ruled on all factual and legal issues that the Superior Court justice would have decided if the case had been tried without reference. Since the justice in entering judgment adopted the referee's report in full, we will review that judgment as if we were directly reviewing the decisions of the referee. His findings of fact will be reviewed for clear error, *see Severance v. Choate*, 533 A.2d 1288, 1290 (Me.1987); M.R.Civ.P. 53(e)(2), and his exercise of discretion for abuse, *see Adams v. Alley*, 340 A.2d 201, 205–06 (Me.1975).

## I.

### *Venue*

■ Section 909(9)(A) provides that if, as here, the surviving corporation is a foreign corporation, the appraisal suit "shall be brought in the county where the registered office of the [merged Maine corporation] was last located." The Dissenters commenced this consolidated appraisal proceeding in Androscoggin County, the location of the former registered offices of Morse Bros. and T–M Oil Companies. That county is the wrong venue for McLoon Oil Co., which had its registered office in Knox County. We reject, however, as did the referee, Lido's argument that the wrong venue is jurisdictionally fatal to the Dissenters' claim to their appraisal remedy as to McLoon's stock. There is no discernable legislative purpose to be served by treating the statutory appraisal proceeding as anything other than a transitory action leading to a conditional money judgment in favor of dissenting shareholders. "The matter of wrong venue in transitory actions ... is a matter of procedure." *Burtchell v. Willey*, 147 Me. 339, 342, 87 A.2d 658, 660 (1952).

■ For practical purposes the Dissenters are the plaintiffs in this action and Lido, the defendant. An objection to venue in Lido's initial pleading or motion would have been the appropriate means to object to the wrong venue. *See* M.R.Civ.P. 12(b)(3), 12(h)(1). Lido made no such objection for at least ten years. At this late date, Lido will not be heard to object to the consolidation of all three appraisal cases in the county of proper venue for the other two companies. *See Martel v. Town of Old Orchard Beach*, 404 A.2d 994, 998 n. 10 (Me.1979). *See also* 1 Field, McKusick & Wroth, *Maine Civil Practice* § 12.9, at 118 (2nd ed. Supp.1981).

## II.

### *Compliance with Procedural Requirements of the Appraisal Statute*

■ Section 909(9)(E) provides in pertinent part that "[t]he court shall determine whether each shareholder ... has satisfied the requirements of this section and is entitled to receive paryment for his shares." Lido argues that section 909(9)(E) preconditions recovery on strict compliance with the statute's detailed reporting and notice requirements and that the Dissenters did not strictly comply with these requirements. The referee found that the parties had effected notice, fulfilling the purpose behind the reporting and notice requirements, and so had "substantially complied" with those requirements.

The statutory language providing that the court (and here the referee) shall determine compliance imparts a measure of flexibility to the determination whether the shareholder has complied with the prerequisite steps and is entitled to payment. One of the purposes behind the enactment of the Maine Business Corporations Act was to afford a corporation "the greatest possible flexibility with its structures and procedures." *Maine Proposed Business Corporation Act* vii (1971). Under a similar provision in its appraisal statute, Delaware courts enjoy substantial discretionary power "to tailor the appraisal process to

suit the facts of the case." *See Tabbi v. Pollution Controls Indus., Inc.*, 508 A.2d 867, 869 (Del.Ch.1986) ("the statutory requirements are to be liberally construed for the protection of the dissenting stockholders within the limits of orderly corporate procedure and consistent with the purpose of the requirements"). *See also Sarrouf v. New England Patriots Football Club*, 397 Mass. 542, 549, 492 N.E.2d 1122, 1129 (1986) ("The statute is designed to provide an equitable, simple, and expeditious remedy to dissenting stockholders. It should not be construed strictly against them"); *Folk on the Delaware General Corporation Laws* § 262.2, at 151 (2nd ed. 1988).

The referee found that the Dissenters had complied sufficiently with the outlined procedural steps to meet the requirements of section 909 and that under the statute they were entitled to relief. His factual finding is supported by competent evidence and provides an ample foundation for his discretionary ruling that the Dissenters had cleared the preliminary procedural hurdles to maintaining their appraisal action.

### III.

### *Fair Value with No Minority or Nonmarketability Discount*

■ Ten years ago in the *Libby* case we ruled that a stock's fair value under section 909 could appropriately be determined by weighing three factors—the stock's market price, the company's net asset value, and the company's investment value—with the weight to be accorded each factor depending on its reliability as an indicator of fair value. *See In re Valuation of Common Stock of Libby, McNeill & Libby*, 406 A.2d at 60. We recognized that the reliability of each factor will vary with the particular facts and circumstances of each case, so that "[t]he weighing of these interdependent elements of fair value is more akin to an artistic composition than to a scientific process. A judicial determination of fair value cannot be computed according to any precise mathematical formula." *Id.* However, the court should in each case consider all three elements of fair value, even if only to find one or more of them unreliable in the circumstances. *Id.*

■ The Dissenters offered the testimony of two expert appraisal witnesses: Robert Noone testified to the value of the real estate owned by the three companies and Wilfred Hall testified to the companies' net asset value. Lido countered with two experts of its own: Glenn Cooper for T–M and McLoon used a discounted cash analysis and for Morse Bros. a net asset value; James Ahearn testified about the hypothetical returns on investment in comparable business properties. The referee decided to use Hall's and Cooper's testimony in valuing the shares for T–M and McLoon, allotting 75% weight to Cooper's analysis and 25% to Hall's analysis, and to accept in full Hall's valuation of Morse Bros. By that means the referee found the total value of each company; then to find the value of each Dissenter's interest in the company, he had only to multiply the Dissenter's percentage of ownership times the company's total value. The referee's calculation was as follows:

T–M Oil Co.

| | |
|---|---|
| Cooper valuation | $1,181,422 × .75 = $ 886,066.50 |
| Hall valuation | $1,057,700 × .25 = $ 264,425.00 |
| Total Value | $1,150,491.50 |

Each Dissenter's proportion: $82,178

McLoon Oil Co.

| | |
|---|---|
| Cooper valuation | $704,952 × .75 = $528,714 |
| Hall valuation | $655,100 × .25 = $163,775 |
| Total Value | $692,489 |

Each Dissenter's proportion: $173,122

Morse Bros. Oil Co.

| | |
|---|---|
| Hall valuation (Total Value) | $318,500 |

Each Dissenter's proportion: $79,625

In sum, the referee held that the fair value of each Dissenter's stock was his proportionate share of the full value of each company, as determined from the expert appraisal testimony presented by the parties. The referee expressly rejected Lido's contention that he should discount the full value of each company because of the minority status and lack of marketability of the Dissenters' stock. On appeal Lido's only serious challenge to the referee's finding of fair value is directed at the referee's recognition of the Dissenters' full proportionate interest in the whole value of each company, free of any minority or nonmarketability discount. We find Lido's arguments for such discounts unpersuasive. In our view application of those discounts would run directly counter to our appraisal statute's purpose of protecting dissenting shareholders. The referee's finding of aggregate fair value of $334,925 for each Dissenter is fully supported by the evidence and by a correct application of legal principles.

The referee applied the three-factor valuation method used in *Libby* but noted that the method has come under some criticism since 1979, specifically citing *Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del.1983), for the proposition that the modern approach to valuation "must include proof of value by any techniques or methods which are generally considered acceptable in the financial community, and otherwise admissible in court."[5] *Id.* at 712–13. *Weinberger* by its own terms broadened rather than changed the basic method of stock valuation used in *Libby*. As the Delaware court in *Weinberger* noted:

> The basic concept of value under the appraisal statute is that the stockholder is entitled to what has been taken from him, viz., *his proportionate interest in a going concern.* In determining what fig-

ure represents this true or intrinsic value, the appraiser and the courts must take into consideration all factors and elements which reasonably might enter into the fixing of value.

*Id.* at 713 (quoting *Tri–Continental Corp. v. Battye*, 31 Del.Ch. 523, 526, 74 A.2d 71, 72 (1950)) (emphasis added). This approach is consistent with our analysis in *Libby*, where we realized that stock valuation is necessarily a fact-specific process. *See Libby*, 406 A.2d at 60. The only evidence available to the appraiser in *Libby* went toward establishing market price, net asset value, and investment value. *Libby's* three-part analysis is elsewhere known as the Delaware block method of stock valuation. We note that since *Weinberger* a number of jurisdictions have continued to rely primarily upon the three-factor analysis used in *Libby*. *See, e.g., Walter S. Cheesman Realty Co. v. Moore*, 770 P.2d 1308 (Colo.Ct.App.1988); *Richardson v. Palmer Broadcasting*, 353 N.W.2d 374 (Iowa 1984); *Columbia Management Co. v. Wyss*, 94 Or.App. 195, 765 P.2d 207 (1988); *Blasingame v. American Materials, Inc.*, 654 S.W.2d 659 (Tenn.1983).

Nothing in *Libby*, however, prevents the consideration and use of any other generally accepted and admissible valuation techniques. In the case at bar the evidence presented by the witnesses went toward establishing those same three criteria of value; even the discounted cash flow analysis used by Cooper deals essentially with investment value.[6] Although Lido argues that the three-part test is outmoded, we find the approach as outlined in *Libby* entirely compatible with *Weinberger* and the broadening of the Delaware block method. *See Pioneer Bancorporation, Inc. v. Waters*, 765 P.2d 597, 599 (Colo.Ct. App.1988); *Cede & Co. v. Technicolor, Inc.*, 542 A.2d 1182, 1186–87 (Del.1988);

---

**5.** *Weinberger* was a suit for breach of fiduciary duty in a cash-out merger, in which the Delaware Supreme Court adopted the same approach to stock valuation as in an appraisal rights proceeding. *Weinberger v. UOP, Inc.*, 457 A.2d 701, 712 (Del.1983).

**6.** Lido's witness Cooper had available the actual earnings of the Maine properties of T–M and McLoon for the years after the 1976 merger. Typically the investment value factor is based upon an averaging of past earnings as a predictor of the future. *See Libby*, 406 A.2d at 59. The availability of data on actual future earnings here led the referee to accord a 75% weighting to Cooper's valuation of those two companies.

*Richardson v. Palmer Broadcasting,* 353 N.W.2d at 378.

Lido tries to use *Weinberger* and its progeny as a basis upon which to introduce the use of minority and nonmarketability discounts as a generally accepted alternative method of valuation. As previously noted, however, *Weinberger* advocated the same definition of "fair value" of a single shareholder's stock as did *Libby:* "his proportionate interest in a going concern." 457 A.2d at 713. *Weinberger* stands for the simple proposition that the value of the business entity as a whole should be determined by the best available valuation methods. No one can quarrel with that proposition. It has nothing to do, however, with the critical issue raised by Lido's appeal, which arises only after completion of the valuation of the whole firm by the best available methods: Should the dissenting shareholder's proportionate part of that whole firm value as so determined be discounted because of the minority status and lack of marketability of his stock? The Delaware Supreme Court, the same court that decided *Weinberger,* has recently said no: Delaware emphatically rejects the application of those discounts in determining the fair value of a dissenting shareholder's stock. *See Cavalier Oil Corp. v. Harnett,* 564 A.2d 1137, 1141 (Del.1989) ("application of a discount to a minority shareholder is contrary to the requirement that the company be viewed as a going concern"). *See also Richardson v. Palmer Broadcasting,* 353 N.W.2d at 378; Haynsworth, *Valuation of Business Interests,* 33 Mercer L.Rev. 457, 489 (1982) [hereinafter "Haynsworth"]. *But see Perlman v. Permonite Mfg. Co.,* 568 F.Supp. 222, 231 (N.D.Ind. 1983) (applying Indiana law); *Hernando Bank v. Huff,* 609 F.Supp. 1124, 1126 (N.D. Miss.1985) (applying Mississippi law).

■■■ The appraisal remedy has deep roots in equity. The traditional rule through much of the 19th century was that any corporate transaction that changed the rights of common shareholders required unanimous consent. The appraisal remedy for dissenting shareholders evolved as it became clear that unanimous consent was inconsistent with the growth and development of large business enterprises. By the bargain struck in enacting an appraisal statute, the shareholder who disapproves of a proposed merger or other major corporate change gives up his right of veto in exchange for the right to be bought out— not at market value, but at "fair value." *See* Fischel, *The Appraisal Remedy in Corporate Law,* 1983 A.B.F.R.J. 875, 877; 12B W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 5906.1, at 342 (rev. perm. ed. 1980). Methods used in valuing stock for tax, probate, ERISA, and like purposes in which market value is of the essence are inapposite to the determination of the fair value owed to dissenting shareholders. *See* Haynsworth at 459 ("The purpose of applying these discount variables is to determine the investment value or fair market value of a minority interest in the context of a hypothetical sale between a willing seller and buyer, a situation that does not exist in the dissenting shareholder situation"). In the statutory appraisal proceeding, the involuntary change of ownership caused by a merger requires as a matter of fairness that a dissenting shareholder be compensated for the loss of his proportionate interest in the business as an entity. The valuation focus under the appraisal statute is not the stock as a commodity, but rather the stock only as it represents a proportionate part of the enterprise as a whole. The question for the court becomes simple and direct: What is the best price a single buyer could reasonably be expected to pay for the firm as an entirety? The court then prorates that value for the whole firm equally among all shares of its common stock. The result is that all of those shares have the same fair value.

■■■ Our view of the appraisal remedy is obviously inconsistent with the application of minority and nonmarketability discounts. Lido would have us discount the stock for minority status and lack of marketability in order to reflect what it calls the "real world" value of the stock to the Dissenters. Lido bases its argument upon a plain misreading of our analysis in *Libby.* We there in a footnote approved the "will-

ing buyer/willing seller" approach used by the court-appointed appraiser in *Libby* "so far as it goes" to determine stock *market* price; we did not, however, equate the price at which a willing seller would sell and a willing buyer would buy a minority block of stock with its fair value under the appraisal statute. *See Libby*, 406 A.2d at 61 n. 8. The willing seller/willing buyer price is indicative only of stock market price, and that is only one of the three factors used in the *Libby* analysis of the fair value of stock listed on the New York Stock Exchange. Especially in fixing the appraisal remedy in a close corporation, the relevant inquiry is what is the highest price a single buyer would reasonably pay for the whole enterprise, not what a willing buyer and a willing seller would bargain out as the sales price of a dissenting shareholder's shares in a hypothetical market transaction.[7] Any rule of law that gave the shareholders less than their proportionate share of the whole firm's fair value would produce a transfer of wealth from the minority shareholders to the shareholders in control. Such a rule would inevitably encourage corporate squeeze-outs. *See* Haynesworth at 489. As the Delaware Supreme Court stated recently in *Cavalier Oil Corp. v. Harnett*,

> to fail to accord to a minority shareholder the full proportionate value of his shares imposes a penalty for lack of control, and unfairly enriches the majority shareholders who may reap a windfall from the appraisal process by cashing out a dissenting shareholder, a clearly undesirable result.

*Cavalier Oil Corp. v. Harnett*, 564 A.2d at 1141. We agree.

In the case at bar the referee explicitly held that discounting the value of the Dissenters' stock because they chose to dissent from the merger and to exercise their appraisal rights would be inconsistent with the concept of fair value under the appraisal statute. Relying on testimony by Lido's own expert that no market exists for the stock, the referee found that market price has no reliability in the calculus of fair value in this case and accorded no weight to any market price factor.[8] As a matter of law, the Dissenters are entitled to their proportionate share of each Maine company at its full fair value.

## IV.

### *Expert Testimony*

■ In attacking the referee's fair value determination, Lido also argues that he erred in admitting in evidence the testimony of Robert Noone, the Dissenters' real estate appraisal expert. Noone appraised

---

7. *See Folk on the Delaware General Corporation Laws* § 262.9.1, at 23 (2d ed. Supp.1989) [hereinafter *"Folk"*]; Coleman, *The Appraisal Remedy in Corporate Freeze–Outs; Questions of Valuation and Exclusivity*, 38 Sw.L.J. 775, 778 (1984); Brudney & Chirelstein, *Fair Shares in Corporate Mergers and Takeovers*, 88 Harv.L. Rev. 297, 307 (1974); Eisenberg, *The Legal Roles of Shareholders and Management in Modern Corporate Decisionmaking*, 57 Calif.L.Rev. 1 (1969); Note, *Valuation of Dissenters' Stock Under Appraisal Statutes*, 79 Harv.L.Rev. 1453, 1456 (1966). *See also* Schaffer, *The Fallacy of Weighting Asset Value and Earnings Value in the Appraisal of Corporate Stock*, 55 S.Cal.L.Rev. 1031, 1036 (1982); Brudney & Chirelstein, *Restatement of Corporate Freeze-outs*, 87 Yale L.J. 1354, 1372 (1978). *But see* Seligman, *Reappraising the Appraisal Remedy*, 52 Geo.Wash.L.Rev. 829, 837 (1984); Fischel, *The Appraisal Remedy in Corporate Law*, 1983 A.B.F.R.J. 875, 902.

8. In the absence of any trading history on any market, Lido's attempt to construct a hypothetical market for this stock is a particularly useless—and dangerously misleading—exercise. In the situation in which the stock in question has never been traded on a market, courts and commentators alike have rejected construction of a market as too speculative to be helpful in the appraisal process. *See, e.g., Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137, 1141 (Del.1989); *Sarrouf v. New England Patriots Football Club*, 397 Mass. 542, 549, 492 N.E.2d 1122, 1127 (1986); *In re Glosser Bros.*, 382 Pa.Super. 177, 555 A.2d 129, 134–35 (1989); *Folk*, § 262.9.2.3, at 173 (2d ed. 1988); Haynsworth at 498 n. 174. *But see Armstrong v. Marathon Oil Co.*, 32 Ohio St.3d 397, 411, 513 N.E.2d 776, 789 (1987). Even if the stock had a reliable market price, any discount or premium would already be taken into account through this factor and no separate discounting *per se* of the whole fair value would be in order. *See Ford v. Courier–Journal Job Printing Co.*, 639 S.W.2d 553, 556–57 (Ky.Ct.App. 1982); *Columbia Management Co. v. Wyss*, 94 Or.App. 195, 205–06, 765 P.2d 207, 213 (1988); *Blasingame v. American Materials, Inc.*, 654 S.W.2d 659, 669 (Tenn.1983).

39 properties of the three Maine corporations as of 1976. His appraisal method involved comparing the companies' properties with comparable properties that had recently been sold, taking into account such individual factors as size and location before arriving at an appraised value. Lido was given ample opportunity to examine Noone's appraisals prior to the hearings, and Lido's own experts relied on Noone's appraisals in preparing their opinions.

At the hearing, Lido objected to Noone's testimony on the ground that his written appraisals did not include information on the comparables he had used and so lacked a factual basis. The referee suspended Noone's testimony to allow Noone to produce the missing data on comparables. When his testimony resumed, Noone had reconstructed data on 46 of his 100 comparables. Lido renewed its objection to Noone's testimony but did not cross-examine him on the new data.

The referee admitted the Noone testimony and in his report found no unfairness to either party in using the Noone appraisals as the basis for expert opinions. By the time Noone left the stand, he had provided a sufficient factual basis for his testimony to withstand challenge under M.R.Evid. 705. *See Maietta v. International Harvester Co.,* 496 A.2d 286, 293 (Me.1985); *E.N. Nason v. Land–Ho Dev. Corp.,* 403 A.2d 1173, 1180 (Me.1979). *See also* Field & Murray, *Maine Evidence* § 705.1, at 286–87 (1987). The referee committed no error in admitting the Noone testimony. The weight to be accorded the testimony was then up to him as the factfinder.

## V.

### *Interest*

■ 13–A M.R.S.A. § 909(9)(G) provides that the Superior Court's judgment "shall include an allowance for interest at such rate as the court may find to be fair and equitable in all the circumstances, from the date on which the vote was taken on the proposed corporate action to the date of payment." Relying on the evidence presented by the parties about the interest rates prevailing between 1976 and 1987, and noting that the current prejudgment interest statute uses an 8% rate, the referee selected a rate of 8% for the interest to be allowed the Dissenters on the fair value of their stock from December 6, 1976, to the date of payment. Then the referee ruled that the 8% interest should be simple interest, not compound.[9] While we uphold the referee's choice of an 8% rate as within his discretion, we reverse as legal error the referee's failure to award compound interest in the circumstances of this case.

■ The referee chose 8% as the interest *rate* because that percentage fell at the approximate middle of the range of interest rates earnable in the pertinent eleven-year period: "in excess of the interest paid on savings accounts and time deposits … and … lower than the average paid on most commercial paper," as the referee specifically found. We find no abuse of discretion in the choice of an 8% rate. Neither Lido's argument that delay and alleged wrongdoing by the Dissenters should lower the rate nor the Dissenters' argument that the actual market rate was much higher persuades us that the referee committed any reversible error in deciding that the 8% rate was "fair and equitable." The referee considered Lido's allegations of wrongdoing and debts owed by the Dissenters and found them "ambiguous" at best.[10] As for the eleven-year delay in the trial, Lido had

---

9. In adopting the referee's report in full, the court said of the referee's interest allowance: "Considering the substantial sums to be awarded [the Dissenters], the referee s determinations regarding interest cannot be viewed as either unfair or inequitable." The size of the principal amount legally due the Dissenters has no relevance to the interest appropriately allowed on that principal.

10. Lido's suit against the Dissenters for misapplication of funds and other moneys was dismissed for want of prosecution. See n. 4 above. In any event, to the extent that the proffered evidence of moneys allegedly owed the Maine companies was relevant, the referee expressly stated that he considered it in fixing the fair value of those companies. To consider the same evidence in fixing interest would have been "double counting."

as much responsibility and opportunity to move the litigation forward as the Dissenters did, and its numerous changes of counsel plainly slowed up resolution of the dispute. The referee understandably concluded that both sides shared blame for the delay. The referee kept well within the scope of the discretion given him by section 909(9)(G) by choosing an interest rate (8%) that "split the difference" among the prevailing rates of the period. *See Universal City Studios, Inc. v. Francis I. duPont & Co.*, 334 A.2d 216, 222 (Del.1975); *Moore v. New Ammest*, 6 Kan.App.2d 461, 473, 630 P.2d 167, 176 (1981); *Ford v. Courier–Journal Job Printing Co.*, 639 S.W.2d 553, 557 (Ky.Ct.App.1982); *Piemonte v. New Boston Garden Corp.*, 377 Mass. 719, 735, 387 N.E.2d 1145, 1154 (1979); *Hernando Bank v. Huff*, 609 F.Supp. at 1129; Grant, *Appraisal Rights: Allowance for Prejudgment Interest*, 17 B.C. Indus. & Comm.L. Rev. 1 (1975) [hereinafter "Grant"].

[redacted] Although the referee committed no abuse of discretion in selecting the 8% rate, he did commit an error of law in awarding that rate as simple interest, rather than compound. He fell into this error of law by misapplying the evidence of prevailing interest rates from which he derived his 8% rate and by an erroneous reliance upon *Ginn v. Penobscot Co.*, 342 A.2d 270 (Me. 1975). *Ginn* was a personal injury action in which we considered whether statutory postjudgment interest should be calculated on the sum of the judgment plus the prejudgment interest awarded under 14 M.R.S.A. § 1602. *Ginn* contains no statement whatsoever with regard to the propriety of awarding compound versus simple interest in the sense the parties are using those terms here. Least of all did its pronouncements, which relate to the statute generally applicable to personal injury and other actions where no interest rate is prescribed by agreement of the parties or by specific substantive statutory provisions, have anything to do with what is "fair and equitable" interest under the appraisal rights statute.

[redacted] Prejudgment interest under section 1602 is explicitly a procedural device to encourage expeditious litigation. *See id.*, 342 A.2d at 280–81; *Batchelder v. Tweedie*, 294 A.2d 443, 444 (Me.1972). As a matter of law, interest under the appraisal statute is not a mere procedural incentive but is a substantive right, intended to reimburse the Dissenters for the lost use of their money during the pendency of the appraisal proceeding while the corporation retained control and use of it. *See Universal City Studios*, 334 A.2d at 222 ("the purpose of interest is to fairly compensate [dissenting shareholder] plaintiffs for their inability to use the money during the period in question"); *Hernando Bank v. Huff*, 609 F.Supp. at 1129 ("the rate is determined with a view towards compensating the dissenting stockholders for their inability to use the money owed them for their shares during the time fair value is calculated"); *In re Glosser Bros.*, 382 Pa.Super. 177, 555 A.2d 129, 146 (1989) (the interest awarded is to be "fair compensation to the dissenters for deprivation of the fair value of their stock from the effective date of the merger"). One commentator has forcefully noted that

> in the absence of compound interest, the corporation could force the dissenter to sell his shares at less than fair value. If the corporation initially makes a low settlement offer, lengthy appraisal proceedings are inevitable. However, the allowance of only simply interest on the appraisal award could, in some cases, result in a situation where it would be more profitable for the shareholder to accept the settlement offer and invest the money in a savings account, drawing compounded interest quarterly, rather than go through the lengthy appraisal process. This result is clearly inconsistent with the purpose of the appraisal statutes which is to guarantee the dissenting shareholder fair value of his shares and to encourage the corporation to make a fair settlement offer.

Grant at 19–20. Compounding the 8% interest rate selected in this case is the only fair and equitable way to compensate the Dissenters for the lost use of their funds

for nearly thirteen years.[11] *See Sarrouf,* 397 Mass. at 551, 492 N.E.2d at 1129; *Armstrong v. Marathon Oil Co.,* 32 Ohio St.3d 397, 418, 513 N.E.2d 776, 797 (1987).

The referee's allowance of only simple interest represents a misapplication of the evidence of record on the basis of which he chose an 8% rate. All of that evidence, whether of savings accounts at the low end of the range or commercial paper at the upper, related to interest paid on a regular periodic basis, usually quarterly or more frequently. When and as the payee received each payment of interest, that amount became available to the payee to produce interest income thereafter. The Dissenters can be given the equivalent of the 8% interest rate prevailing between 1976 and the hearing only by applying that rate on a compound basis. The compounding should be done at least as frequently as annually. *See Piemonte v. New Boston Garden Corp.,* 377 Mass. at 735, 387 N.E.2d at 1154.

Ordinarily, we would remand the case for reconsideration of the issue of interest in accordance with correct legal principles. Given the nature of the evidence on which the referee relied in this case, however, we hold that he could not deny compound interest. By our decision we do not mean to suggest that compound interest is required by the appraisal statute in all cases. Here, however, on the evidence supporting the 8% determination and in the absence of any proper basis for withholding compounding, we simply modify the judgment of the Superior Court to allow 8% interest compounded annually.

We go no further than to require compounding. Contrary to the Dissenters' argument that they are also enti-tled to the higher postjudgment interest prescribed by the statute that generally applies to civil judgments,[12] the interest awarded under the appraisal statute prevails until such time as Lido pays the Dissenters in exchange for their surrendering their stock certificates to Lido. Section 909(9)(G), crafted specifically by the legislature to govern interest in appraisal rights proceedings, overrides the generally applicable postjudgment interest statute. *See Beaulieu v. City of Lewiston,* 440 A.2d 334, 345 (Me.1982) ("general statutory provisions usually yield to specific ones"). The appraisal rights statute in providing that the "fair and equitable" interest determined for the particular circumstances shall run "to the date of payment" means precisely what it says. The word "payment" cannot be read "judgment." There is good reason for the appraisal statute to have its own distinctive interest provisions. One reason has already been noted in the substantive compensation purpose of allowing interest on "fair value." A further reason rests in the equitable nature of appraisal proceedings and the fact that the judgment in these cases is not an ordinary money judgment, but rather is an equitable order running against the corporation directing it to pay the Dissenters the fair value of their shares "only upon and concurrently with the surrender to the corporation of the ... certificates representing such shares." 13–A M.R.S.A. § 909(9)(F). The court's supervision of the dissenting shareholders' appraisal remedy continues through the enforcement of its equitable order of conditional payment. *See Hernando Bank v. Huff,* 609 F.Supp. at 1129. *But see Universal City Studios,* 334 A.2d at 223; Grant at 20.

11. We reject Lido's argument that the language of the appraisal statute will not support the award of compound interest. The statute provides that interest shall be awarded at a fair and equitable rate, allowing the finder of fact discretion as to what fairness and equity require in any given factual situation. *See, e.g., Armstrong v. Marathon Oil Co.,* 32 Ohio St.3d at 420, 513 N.E.2d at 797; *Piemonte v. New Boston Garden Corp.,* 377 Mass. 719, 735, 387 N.E.2d 1145, 1154 (1979).

12. The current postjudgment interest provision, 14 M.R.S.A. § 1602–A (1989), provides that "the version of section 1602 repealed by this Act shall apply to all complaints filed which relate to actions for which the incident giving rise to the cause of action occurred before the effective date of this Act." 14 M.R.S.A. § 1602 (1971), *repealed by* P.L.1977, ch. 147 (eff. Oct. 24, 1977), was in effect on December 6, 1976, and provided in pertinent part that "[f]rom and after date of judgment, interest shall be allowed at the rate of 10% per year."

## VI.

### Attorney Fees

 Section 909(9)(H) provides that as a matter of course the costs and expenses of the appraisal proceeding are assessed against the corporation, unless the dissenting shareholders reject the corporation's offer in bad faith. This section also provides:

> If the fair value of the shares as determined materially exceeds the amount which the corporation offered to pay therefor ... the court in its discretion may award to any shareholder who is party to the proceeding such sum as the court may determine to be reasonable compensation to any expert or experts employed by the shareholder in the proceeding, and may, in its discretion, award to any shareholder all or part of his attorney's fees and expenses.

The referee found the fair value of the Dissenters' shares to be over 260% of the amount Lido offered to pay therefor. Thus the "materially exceeds" precondition for the discretionary award of expert and attorney fees was clearly triggered. The referee awarded the Dissenters expert expenses and compensation, but did not award them any attorney fees. That, the Dissenters argue, was an abuse of discretion.

The effect of section 909(9)(H) is to eliminate the American Rule regarding the dissenting shareholders' attorney fees wherever, as here, the corporation has offered the shareholders "materially" less than the ultimately determined fair value of their shares. In that situation the court, freed from any presumption that both sides must pay for their own counsel, awards the shareholders such part or all of their attorney fees as it in its discretion finds reasonable in all of the circumstances. The statute has the salutary purpose of providing an incentive for the corporation to make a realistically fair offer at the outset, and it tends to offset the chilling effect that a costly appraisal proceeding has upon shareholders' election of the statutory remedy. *See Blake v. Blake Agency*, 107 A.D.2d 139, 151, 486 N.Y.S.2d 341, 350 (1985).

In the case at bar, although a different referee examining the same circumstances might have justifiably exercised his discretion to grant the Dissenters part or even all of their attorney fees, we cannot find any abuse of discretion in this referee's denial of those fees. That action fell within the scope of his allowable discretion. He did give the shareholders the full fees of their experts, a significant part of their litigation costs. Also, because two of the former corporations were owned about equally by the dissenting shareholders and the other Pescosolido family members (McLoon and Morse Bros.) and the Dissenters are by our mandate being compensated in interest for the loss of the fair value of their stock during the pendency of the litigation, it does not seem unfair for each side to bear its own expenses of legal representation. The Dissenters do not persuade us of any reason to disturb the referee's discretionary call on attorney fees.

The entry is:

Judgment modified to allow 8% interest compounded annually in accordance with the opinion herein; judgment as so modified affirmed. Costs on appeal allowed to the dissenting shareholders.

All concurring.